Theodoros KONTOS

v.

Liberian S.S. SOPHIE C., her boats, engines, tackle, apparel, etc., Peter Paul Vucetic and John Doe, both non-residents, individually, and as Masters, and Southern Star Shipping Co., Inc., and Excelsior Shipping Co., Ltd., both foreign corporations or associations, as owners and/or operators of the Liberian S.S. Sophie C.

No. 269 of 1959.

United States District Court
E. D. Pennsylvania.

Dec. 23, 1964.

Sidney J. Smolinsky, Philadelphia, Pa., for libelant.

Harrison G. Kildare, Philadelphia, Pa., for respondent.

LUONGO, District Judge.

The trial of this matter was not long, but it was drawn out. It was started at a time when libelant was in this country, but had to be suspended to enable respondent to conclude its discovery and the taking of depositions. The trial, therefore, started on December 17, 1963. Testimony was presented on December 17, 18 and 19, 1963, and on June 17, 1964. In addition, a number of depositions were presented. Upon the pleadings and the proof thus submitted, I make the following

### FINDINGS OF FACT

1. Libelant, Theodoros Kontos, is a citizen of Greece who resided in that country until September 1962 at which time he married a citizen of the Netherlands and he has resided in the latter country since that time.

2. Respondent, the SS SOPHIE C., is a general cargo vessel engaged in foreign trade, registered under the laws

of the Republic of Liberia and flying the Liberian flag.

3. Respondent, Southern Star Shipping Company, Inc., a New York corporation with offices located in New York City, is agent for various shipowners, including the owner of the SOPHIE C., while the vessels of such owners are located in American waters. It was the American agent for the SOPHIE C. at the time of the events material to these proceedings. Its officers are both United States and Greek citizens and its sole stockholder, George Coumantaros, is a United States citizen.

4. Excelsior Shipping Company, Ltd., a Liberian corporation, was, at the times here material, the owner of the SOPHIE C. Its officers were United States and Greek citizens. Its sole stockholder, John Coumantaros, is a Greek citizen who resides in Argentina. It maintained a general agent in Piraeus, Greece.

5. Peter Paul Vucetic was master of the SOPHIE C. until October 22, 1957, and Nicolaos Vekios was master thereafter. They were citizens of Greece as were all except four of the 35 to 40 members of the ship's crew.

6. On October 17, 1957, at the port of San Pedro, California, libelant made arrangements to join the SOPHIE C. as a fireman. At that time he requested and was granted an advance of $40 against the amount to be earned in the future, to tide him over while in the port of San Pedro until he joined the crew.

7. On October 23, 1957, libelant signed articles of employment as a crew member on the SOPHIE C. with the rating of fireman, at the wage of $120 per month, for one or more voyages to a port of final discharge at the discretion of the master.

8. The articles of employment, designated "Crew Roll and Agreement" which libelant signed, were printed in both the English language and the Greek language. Libelant is able to read and write the Greek language and he was familiar with and understood the terms and conditions contained in the articles of employment when he signed them.

9. The articles of employment contained a provision that "in the event of illness or death resulting from ordinary causes while in service, the Owner's liability as regards treatment, maintenance, and compensation is to be settled in accordance with the provisions of the Greek Merchant Shipping Collective Agreement of 1951."

10. As a fireman aboard the SOPHIE C., the libelant's tour of duty in the engine room was 8:00 a. m. to noon, and 8:00 p. m. to midnight during each day of the week. His duties consisted of changing and cleaning the furnace burners and checking the fire, steam, and water.

11. From the time libelant signed on in October 1957, until April 1958, the SOPHIE C. made a series of voyages between San Pedro, California, San Juan, Peru and ports in Japan.

12. On April 14, 1958, the SOPHIE C. arrived in the port of Hirohata, Japan. Libelant, having finished his morning watch in the engine room at noon and being scheduled to return to duty at 8:00 p. m., went to his cabin, washed his hands, had his noon meal in the mess room, and returned to his room where he slept for one or two hours.

13. When libelant awakened, the SOPHIE C. was preparing to dock. Libelant made preparations to go ashore and, while bathing and shaving, drank whiskey or rum. He left his room, located one deck below the main deck, and went to the master's room, located on an upper deck, some three or four flights of stairs above the deck where libelant's room was, for the purpose of obtaining a shore pass and a portion of his wages for use while ashore.

14. The master refused libelant's request for a shore pass because of libelant's drunken condition, and ordered him to return to his room. At that time the vessel was docked and relatively free of motion.

15. I do not accept as credible libelant's testimony that he was so drunk that he remembers only a few details of

what happened from the time he left his room to go to the master's room.

16. After the libelant left the master's room, he was seen by the Third Officer, Mr. Bafaloukas, walking in the passageway of the officers' deck, located one deck above the main deck. The Third Officer saw libelant swing at a glass door, stopped him and warned him that he might hurt himself, whereupon libelant desisted and went on his way.

17. Libelant did not return to his room, as he had been ordered to do by the master, but instead went to the crew's smoking room. He arrived there safely. At 5:00 p. m., while in the smoking room, libelant, in anger at being refused a shore pass, drove his fist through a glass door, sustaining a cut in the area of the wrist.

18. Intoxicating beverages were not prohibited aboard the SOPHIE C. Crew members could purchase whiskey or beer, but were required to do so through the ship's steward. The cost thereof was deducted from the seamen's wage account. In the six months voyage, libelant purchased one bottle of whiskey from the steward.

19. Notwithstanding that liquor was permitted aboard, the SOPHIE C. was well run, was not disorderly or dangerous, was reasonably fit for its intended use, and was seaworthy.

20. Libelant was given first aid treatment aboard the vessel, and thereafter was promptly taken ashore at Hirohata where the wound was sutured and dressed by Japanese physicians. Following this incident, libelant was unfit for duty and did not work aboard the vessel.

21. Libelant was given medical treatment ashore again at Hirohata, and when the vessel moved on to Hiroshima, where it remained from April 22 to April 30, he was there given medical treatment consisting mainly of dressing changes.

22. On April 26, 1958, the doctor at Hiroshima recommended one week's rest, which advice was entered in the vessel log. The rest prescribed did not require a total abstinence from performance of duties, only the avoidance of duties requiring the use of the injured arm.

23. On April 29, 1958, libelant returned to duty in the engine room, as the vessel was leaving Japan enroute to the United States. During the trip to the United States, libelant's wound became infected, causing pain and swelling.

24. Notwithstanding the condition of his hand, libelant performed his duties in the engine room with the assistance of other crew members. Because of a reduced sensitivity in his right hand to the presence of heat, libelant occasionally burned that hand when changing burners.

25. The SOPHIE C. arrived at San Francisco on May 13, 1958. On May 15, 1958, libelant was taken by the ship's agents to the Overseas Medical Center where he was examined by Dr. William H. Rustad, head of the Center and a general surgeon of established competence and experience, who prescribed hospitalization to eliminate the infection in libelant's wound.

26. Libelant signed off the vessel on May 16, 1958, and was admitted to the Hahnemann Hospital where he remained until June 6, 1958. An operation was performed to treat the infection. In the course of the operation, there was found in the wound heavy suture material (of the type commonly used in Japan) which contributed to the infection. Dr. Rustad diagnosed the injury as a partial severance of the median nerve and a cut of the long tendon to the right thumb, producing restriction in the movement of the thumb and first two fingers and loss of sensation in that area of the right hand. Dr. Rustad's diagnosis was confirmed by Dr. L. D. Howard, a specialist in reconstructive surgery, who was called in by Dr. Rustad for consultation.

27. Dr. Howard and Dr. Rustad were of the opinion that when the infection had completely subsided, further corrective surgery was indicated to repair the injured median nerve and tendon. Both were of the opinion that the shorter the

delay in performing the operation after the total elimination of infection, the greater the probability of complete success; that there was a high probability of complete success for at least six months after the injury and a gradual diminution in the probabilities of success if the operation were delayed beyond one year after the accident; that such surgery might have beneficial results for as much as five years following the accident.

28. Following discharge from the hospital, libelant remained under the care of Dr. Rustad until June 10, 1958, when he was discharged from Dr. Rustad's care to enable him to return home to Greece. Libelant was given a detailed report to assist the doctors who would continue his treatment in Greece. Dr. Rustad fully informed the vessel's agent concerning the desirability of further surgery.

29. When libelant signed off the SOPHIE C. at San Francisco on May 16, 1958, there was deducted from his pay the $40 advance hereinabove referred to in Finding No. 6.

30. The vessel's agents paid "sick wages" to libelant while he was in the hospital, paid all the medical and hospital bills, and repatriated him from San Francisco to Athens, Greece, by plane. Libelant left San Francisco on June 13, 1958, arriving in Athens on June 15, 1958.

31. Southern Star Shipping Co., Inc., the American agent for the shipowner, notified the owner's attorney and claims manager in Greece, Panos Coumantaros, that libelant was to be furnished necessary medical care upon his return to Greece.

32. Before he left San Francisco, libelant was given papers which he was to present to the company's office in Athens. Upon his arrival there, libelant did not go to the company's office, but instead went to his mother's home in Mytelene where he remained for almost a year. I do not accept as credible libelant's testimony that he went to the company's office in Piraeus, was referred to Panos Coumantaros, saw him, requested medical treatment and was refused by Coumantaros. I accept as credible the testimony of Mr. Coumantaros and Captain Goumas that libelant did not visit the company's office in Greece.

33. Libelant was in the Greek army from July 1959 until November 1959, when he was discharged because of the condition of his hand.

34. Libelant went back to sea in February 1960. Beginning then, his maritime employment was as follows:

(a) February 19, 1960 to August 15, 1960—fireman on the SS SPEEDWAY.

(b) The end of November 1960 to the end of March 1961—seaman on the SS LEONERKERK.

(c) April 29, 1961 to June 9, 1961—ordinary seaman on the SS BULKOCEANIC.

(d) July 1, 1961 to November 2, 1961 —oiler on the SS BULKSTAR.

(e) December 9, 1961 to April 28, 1962 —wiper on the SS ULYSSES.

(f) June 22, 1962 to August 29, 1962— "sailor" on the SS BEAVERFORD.

(g) October 7, 1962 to February 11, 1963—"sailor" on the SS LLANISHEN.

35. During the foregoing periods of sea duty, libelant stood all of his watches, lost no time from work, received no medical care, and did not mention the condition of his wrist either when he joined the vessels or when he left them. He was inconvenienced, but not incapacitated, in the performance of his duties by the residual effects of his injury.

36. Libelant has some permanent residual effects of the wound which hamper him in the performance of work, but are not incapacitating. The injury to the median nerve has impaired the sense of feeling in a portion of his hand so that he cannot feel heat before his hand sustains a burn. He also has a neuroma, a growth of nerve tissue, on his wrist which, when touched or bumped, causes

a sensation of shock and causes his hand to fly open.

37. The neuroma could have been removed and the median nerve repaired by an operation which would have improved libelant's condition at anytime until he returned to sea in February 1960.

38. Libelant's condition cannot now be improved, he has reached maximum cure. Surgery at this time would not be successful or advisable. There is a minimal possibility that an operation would improve libelant's condition, but a very real danger that it would cause further damage and further impair function.

39. Libelant's injury was caused solely by wilful misconduct on his part, and was not caused or contributed to by unseaworthiness of the vessel.

40. The permanence of libelant's condition was caused by libelant's failure to present himself at the respondent's office in Greece to obtain further medical treatment which had been proffered and which he had been informed he needed.

41. In September 1962, libelant married a citizen of Holland and became a resident of Rotterdam. On March 18, 1963, he obtained employment ashore as a tank cleaner in Rotterdam, Holland. At that time his wife was expecting their first child, due to be born in June.

42. Libelant's employment as a tank cleaner requires him to climb, scrape rust and oil, and carry a bucket filled with scrapings. The work is more strenuous and more taxing than the work libelant had been accustomed to do at sea and his earnings per month are higher as a tank cleaner than they were at sea. Libelant left the sea by choice in order to be with his wife and soon to be born child, and not because he was compelled to do so by any physical infirmity.

43. Respondent did not produce testimony of the master, Nicolaos Vekios, Third Officer Bafaloukos or the Chief Officer George Keremezis. It has accounted for the failure to do so. Captain Vekios is sailing on vessels between Iron Curtain ports, Bafaloukos cannot be located and Keremezis is dead. No unfavorable inferences, therefore, have been drawn against respondent for failure to produce those witnesses or their testimony.

## CONCLUSIONS OF LAW

1. This court has jurisdiction of the parties and of the subject matter.

2. Libelant's claim for damages and for maintenance and cure is governed by Greek law. Under applicable Greek law, libelant is not entitled to recover damages and is barred from an award of compensation because his injuries were caused by his own wilful misconduct and his intoxication.

3. Libelant's claim for wages and penalties is governed by the provisions of Title 46 U.S.C.A. §§ 599 and 596 which are applicable to foreign vessels in waters of the United States.

4. The sum of $40 was unlawfully deducted from libelant's wages at the time of his discharge from the SOPHIE C. at a port in the United States. Libelant is entitled to recover the sum of $40 plus interest from May 16, 1958.

5. The master of the SOPHIE C. neglected, without sufficient cause, to pay to libelant the full amount of the wages due him at the time of his discharge at a port in the United States. The failure to do so subjects the vessel to the payment of a penalty equal to two days' pay for each day the amount is withheld, the duration of said penalty period to be determined in the exercise of the discretion of the trial judge.

6. In the exercise of my discretion, I fix the penalty period at 550 days at $8 per day, double the daily wage rate.

7. Libelant is entitled to recover as penalty the sum of $4,400.

## DISCUSSION

This case presents a choice of law problem, but in the view I take of the evidence, the choice of law will not change the outcome of the case. Libelant contends that the law of the flag, Liberian law, is applicable, while respondent

urges Greek law because of the numerous contacts with Greece.

In Lauritzen v. Larsen, 345 U.S. 571, 73 S.Ct. 921, 97 L.Ed. 1254 (1953) the Supreme Court reviewed the factors to be considered in determining choice of law. It stressed the importance of law of the flag, but advanced as other factors to be considered (1) place of the wrongful act, (2) allegiance or domicile of the injured, (3) allegiance of the defendant shipowner, and (4) place of the contract.

The vessel here is of Liberian registry and flies the Liberian flag. That is the sum and substance of its contact with Liberia. The flag is one of convenience. The sole stockholder of the Liberian corporate owner of the vessel is a Greek citizen. The master and virtually all of the members of the ship's crew were Greek citizens. The libelant is a Greek citizen who at the time of the occurrence still resided in Greece, although he has since left to live in Holland. The shipping articles, written in English and in the Greek language, provided for the applicability of Greek law. The place of the injury (Japan) and the place of the contract (United States), factors entitled to little weight in any event according to Lauritzen because of the transitory nature of the seaman's calling, point toward neither.

■ Applying the factors reviewed in Lauritzen, the law of the flag, in this case a flag of convenience, must give way to the "heavy counterweight" of the preponderating contacts with Greek law.

### GREEK LAW

■ Applying Greek law, there can be no recovery in this case. This libelant concedes.[1] That result appears clear from the testimony of the expert on Greek law, George Daniolos, who testified that under the circumstances as related by libelant, he is entitled to recover neither damages nor maintenance. In support of his conclusions, Mr. Daniolos re-

lied on Law 551 of the Greek Workmen's Compensation Act which covers liability to seamen injured on board ship. Under that Law recovery is allowed "except only in the case where the injured intentionally invited the accident which occurred." (Dep. 32). Since this is such a case there can be no recovery under that provision. When questioned as to whether there were any other grounds upon which libelant might recover, Mr. Daniolos noted that if it could be shown that an accident resulted from the malice of the employer or if it resulted from a breach of regulations in force especially to protect seamen, the suit would be allowed under the ordinary civil law. Those conditions, however, are not relevant here.

### LIBERIAN LAW

I indicated earlier that the choice of law would not effect a change in the outcome of the case. All of the discussion in this section, then, is on the *arguendo* assumption that Liberian law is applicable, although I have concluded that it is not.

■ Under Liberian law, libelant would not be entitled to recover either damages or maintenance and cure. Section 30 of the Liberian Code of 1956 provides:

> *"Adoption of General American Maritime Law.*
>
> Insofar as it does not conflict with any other provision of this title, the non-statutory general maritime law of the United States of America is hereby declared to be and is adopted as the general maritime law of the Republic of Liberia."

Under the non-statutory general maritime law of the United States, recovery, other than for maintenance and cure, may only be predicated on unseaworthiness, not on negligence. Osceola, 189 U.S. 158, 23 S.Ct. 483, 47 L.Ed. 760 (1903).

---

1. "It is abundantly clear that under Greek law, libelant would have no cause for damages or maintenance if the facts, as alleged by libelant, were found to be true." (Libelant's brief, p. 5.)

(a) *Damages for Unseaworthiness:*

Libelant's claim of unseaworthiness is twofold: that the master knowingly permitted intoxicants aboard the vessel; and that the ship's officers permitted libelant to return to his room unaided, knowing that he was intoxicated. Either, according to libelant, compels a finding that the vessel was unseaworthy.

■ A shipowner's absolute and non-delegable duty to furnish a vessel that is seaworthy in all respects, Mahnich v. Southern S. S. Co., 321 U.S. 96, 64 S.Ct. 455, 88 L.Ed. 561 (1944), includes the duty to furnish competent officers and crew. Boudoin v. Lykes Bros. S. S. Co., Inc., 348 U.S. 336, 339–340, 75 S.Ct. 382, 99 L.Ed. 354 (1955). Further, the master and ship's officers are under a duty to see to the safety of the crew. Jensen v. United States, 184 F.2d 72 (3d Cir. 1950).

■ Applying these principles, unseaworthiness has not been established. First, as to the liquor on board the vessel. The fact that a master allows liquor aboard, even in violation of the ship's articles, does not in and of itself establish unseaworthiness. It is unquestioned that liquor was permitted aboard the SOPHIE C., but other than one reference to rather widespread drinking over the Christmas holiday, the circumstances surrounding which were not detailed, there was no evidence that the ship was not well managed, or that it lacked discipline, or that there was danger to crew, cargo, or ship. Absent a showing of lack of discipline or control, or of danger, I cannot conclude that permitting intoxicating beverages aboard, in and of itself, rendered the vessel unseaworthy.

I reach the same conclusion with regard to the charge that the ship's officers were incompetent because they did not make adequate provision to return Kontos safely to his room when they knew he was intoxicated. At the outset, I am not persuaded that Kontos was as intoxicated as he claims that he was. He testified that he remembered nothing about the details of his accident other than that he went to the master's room to request a pass and was refused because of his drunken condition. I find that hard to believe. The drinking took place in a very limited period of time. He had been on duty until noon. After coming off duty, he washed up, had his noonday meal, and then slept for one or two hours. Thereafter, while performing preparations for going ashore, he drank. It was sometime before 5:00 p. m. when he went to the master's room to request a pass. His condition was very likely such that the master considered it unwise to permit him to go ashore, particularly since he was due to go back on duty at 8:00 p. m. The fact that the master would not permit him a shore pass under those circumstances does not establish that libelant's condition was such that he was unable to make his way about the vessel. He had managed to get to the master's room unaided. The vessel was at the dock and therefore, presumably, not subject to the usual pitching and tossing of a vessel. In any event, Kontos did not sustain his injury because he was unescorted. He arrived safely at his destination, the crew's smoking room. It was after he had safely negotiated the passage from the master's room to the smoking room that, perhaps disappointed or angered over being denied permission to go ashore,[2] he drove his fist through the glass portion of a door.

Libelant cannot prevail if he only shows that the ship's officers were negligent in failing to see to it that he got back to his room safely; to prevail he has to establish that they were incom-

---

2. In his original libel, Kontos alleged:
  "14. That on April 14, 1958, at Hirohata, Japan, when the Master refused to give Libellant-Petitioner his earned wages and to permit Libellant-Petitioner to go ashore, Libellant-Petitioner was caused to become violently mentally ill and to push his right hand through a glass pane in the salon of the SS SOPHIE C., severely lacerating the volar surface of his lower right forearm and severing a portion of his median nerve and also severing the long tendon of his thumb."

petent as officers because they failed to appreciate the danger of his condition and do more than they did to see to his safety. I cannot say that ship's officers are incompetent because they expect a seaman, even a drunken one, to be able to make his way safely to his room while the vessel is docked.

Spellman v. American Barge Line Co., Inc., 176 F.2d 716 (3d Cir. 1949), relied on by libelant as requiring a finding of incompetence here, does not. It holds only that in a case where a master sent a mentally ill person to a bus depot, gave her a ticket and let her embark, unattended, on a relatively long journey to a hospital for treatment, the question of the master's incompetence and/or negligence should have been left to the jury.

■ Regarding the matter of competence here as a question of fact, I conclude that the master and the ship's officers were not incompetent for failure to furnish Kontos an escort to his room. Wiper v. Erie Sand Steamship Co., 293 F.2d 491 (2d Cir. 1961).

■ Libelant concedes that, generally speaking, intoxication is a valid defense to a damage action, but he contends that, where liquor has been permitted on board a vessel, the defense of intoxication may not be asserted. I regard this as but another prong of libelant's contention that allowing liquor on board a vessel renders it unseaworthy. That has been disposed of. The general rule barring a seaman from recovering damages for injuries caused by his own wilful intoxication is applicable here. The S. S. Berwindglen, 88 F.2d 125 (1st Cir. 1937); Lortie v. American-Hawaiian S.S. Co., 78 F.2d 819 (9th Cir. 1935). See Bentley v. Albatross S.S. Co., 203 F.2d 270 (3d Cir. 1953), where the court allowed recovery for damages when an intoxicated seaman was burned due to a defective radiator, but only because of the unseaworthy condition, the defective radiator.

Libelant's injury was not due to an unseaworthy condition, but was rather due solely to his own wilful intoxication, for which he would not have been entitled to recover even under Liberian law.

(b) *Maintenance and Cure:*

Libelant seeks maintenance and cure, conceding that he may not recover for it under Greek law, but insisting on his right to such recovery under Liberian law. Again assuming *arguendo* that Liberian law were applicable, libelant is not entitled to recover maintenance and cure.

■ It is apparently not disputed that libelant was given medical care up to the time he was repatriated to Greece. The only dispute is over what happened thereafter. I rejected Kontos' testimony that he sought and was refused medical treatment when he arrived in Greece. I accepted the testimony of Panos Coumantaros and Captain Goumas that Kontos did not go to the company's office in Greece for additional treatment. Libelant argues that even if that be true, the duty to provide maintenance and cure is an affirmative one, that the shipowner was duty bound to proffer the indicated treatment and was under a duty to seek libelant out to offer him the treatment, citing Vaughan v. Atkinson, 369 U.S. 527, 82 S.Ct. 997, 8 L.Ed.2d 88 (1962); Murphy v. American Barge Line Co., 169 F.2d 61 (3d Cir. 1948). Neither case goes that far. It is sufficient if the shipowner offers the medical treatment and, where necessary, provides the means to enable the seaman to get to the place where the treatment is to be given. In this case, Kontos was treated in San Francisco and, when he indicated a desire to return to his home in Greece, was furnished transportation, together with papers to present to obtain the additional medical treatment indicated. The company thus made the proffer of treatment. Kontos' failure to take advantage of it was a rejection of the proffered treatment. But whether or not a shipowner is under a duty to seek out a seaman who is entitled to medical treatment is really beside the point here. Kontos could not have recovered maintenance and cure because his injury re-

sulted solely from his own wilful misconduct, W. L. Steed, 33 F.Supp. 353, 1940 Am.Mar.Cas. 406 (E.D.Pa.1940), even under the more favorable (to the seaman) test of "wilful misconduct" which is applied in maintenance and cure cases. See The Quaker City, 1 F.Supp. 840 (E.D.Pa.1931); Bentley, supra, 203 F.2d pp. 273–274.

Under Liberian law, therefore, libelant would not have been entitled to recover maintenance and cure.

## CLAIM FOR WAGES AND PENALTIES

There is no dispute that libelant was paid an advance of $40 against wages to be earned, and that that amount was deducted when he signed off the vessel on May 16, 1958. Libelant seeks to recover that amount plus interest from the date of the withholding and, in addition, he seeks to recover penalties at the rate of two days' pay for each day the amount was withheld.

The claim for the portion of the wages withheld, and for the penalties, are made, respectively, under the provisions of 46 U.S.C.A. § 599 and § 596 which provide, so far as relevant here, as follows:

"599(a) It shall be unlawful in any case to pay any seaman wages in advance of the time when he has actually earned the same * * *. The payment of such advance wages or allotment, whether made within or without the United States or territory subject to the jurisdiction thereof, shall in no case except as herein provided absolve the vessel or the master or the owner thereof from the full payment of wages after the same shall have been actually earned, and shall be no defense to a libel suit or action for the recovery of such wages. * * *"

"596 The master or owner of any vessel making coasting voyages shall pay to every seaman his wages within two days after the termination of the agreement under which he was shipped, or at the time such seaman is discharged, whichever first happens; and in case of vessels making foreign voyages, or from a port on the Atlantic to a port on the Pacific, or vice versa, within twenty-four hours after the cargo has been discharged, or within four days after the seaman has been discharged, whichever first happens; and in all cases the seaman shall be entitled to be paid at the time of his discharge on account of wages a sum equal to one-third part of the balance due him. Every master or owner who refuses or neglects to make payment in the manner hereinbefore mentioned without sufficient cause shall pay to the seaman a sum equal to two days' pay for each and every day during which payment is delayed beyond the respective periods, which sum shall be recoverable as wages in any claim made before the court * * *."

The prohibition against advances and the withholding of wages is applicable to foreign vessels while in waters of the United States and "only such deductions and set-offs for derelictions in the performance of * * * duties shall be allowed against * * * wages as are recognized in the statutes." Isbrandtsen Co. v. Johnson, 343 U.S. 779, 787, 72 S.Ct. 1011, 1017, 96 L.Ed. 1294 (1952). The advance here made, even though at the request of the seaman and for his benefit, is not one of the permissible deductions and he is entitled to recover the amount withheld. Korthinos v. Niarchos, 175 F.2d 730 (4th Cir. 1949); Mavromatis v. United Greek Shipowners Corp., 179 F.2d 310 (1st Cir. 1949); Gonzales v. Isthmian S.S. Co., 1958 Am. Mar.Cas. 97 (E.D.Pa.1957).

The withholding here was to recoup the amount of the advance. This is not "sufficient cause" within the meaning of the statute, Collie v. Fergusson, 281 U.S. 52, 50 S.Ct. 189, 74 L.Ed. 696 (1930); Korthinos v. Niarchos, supra, and subjects the shipowner to the imposition of the penalties prescribed in § 596. Mavromatis v. United Greek

Shipowners Corp., supra; Gonzales v. Isthmian S.S. Co., supra.

▮▮▮▮ Although the penalty is applicable, its duration seems to be committed to the discretion of the trial judge to tailor to the equities of the particular case. Here the advance was made at the request of libelant to enable him to get by until he signed aboard the vessel. The amount of it, in relation to his wages, was relatively small and, therefore, created no great likelihood of contravening the policy underlying the statute, i. e. to prevent the seaman from placing himself in bondage to the shipowner for long periods of time. When he was discharged from the vessel in May 1958, libelant made no request for the payment of the amount so withheld and, indeed, in the original libel filed in this court on July 24, 1959, he made no claim for the amount. A motion to amend the libel to include such wage claim was filed March 31, 1960. I do not mean to imply that demand and refusal is a requisite to the imposition of the penalty, but under these circumstances, the absence of demand is a factor I will consider in mitigation. I will, therefore, assess the penalty commencing with the date of the filing of the motion to amend the libel to claim the withheld wages. Were it not for the congestion of our court calendar and were it not for an interlocutory appeal, suggested, in part at least, by the late revered Circuit Judge Goodrich, sitting specially as a judge of the District Court, this matter should have been resolved in approximately 1½ years. I will, therefore, limit the period of the penalty to 550 days at the double daily wage rate of $8 or a total of $4,400. This is a heavy penalty for withholding $40 but it is one which might well have been avoided by a tender of the withheld amount to libelant or by a payment into court (see Korthinos v. Niarchos, supra.) No such tender or payment was ever made and, consequently, no reason appears to lessen the impact of the apparently harsh result.

### DECREE

And now, this 23rd day of December, 1964, it is ordered and decreed that judgment be entered in favor of libelant, Theodoros Kontos, against respondents, SS SOPHIE C., Excelsior Shipping Co., Ltd. and Southern Star Shipping Co., Inc., in the sum of Forty ($40) Dollars, plus interest from May 16, 1958, and in the further sum of Four Thousand Four Hundred ($4,400) Dollars as penalty.

It is further ordered and decreed that judgment be entered in favor of the respondents on libelant's claim for damages and for maintenance and cure.