**Amelia Zamora De MATEOS, Administratrix of the Estate of Theodore Reyes, Deceased**

v.

**TEXACO PANAMA, INC.**

Civ. A. No. 72–373.

United States District Court,
E. D. Pennsylvania.

Aug. 3, 1976.

Avram G. Adler, Philadelphia, Pa., for plaintiff.

E. Alfred Smith, Timothy J. Mahoney, Philadelphia, Pa., for defendant.

## OPINION AND ORDER

FOGEL, District Judge.

Plaintiff in this action, Amelia Zamora De Mateos, is the Administratrix of the estate of her son, Theodore Reyes, a Panamanian seaman; he died on February 24, 1970; this litigation followed. Suit has been brought under the admiralty law as modified by the Jones Act, 46 U.S.C. §§ 688 *et seq.*, and the Death on the High Seas

Act, 46 U.S.C. §§ 761–768. The complaint alleges that Reyes' death was caused by the unseaworthiness of the vessel, the S.S. Texaco Kenya, and the negligence of the defendant, Texaco Panama, Inc., (Texpan), by its agents; specifically, plaintiff claims that Theodore Reyes was not given prompt or adequate medical attention after he became ill on board the Texaco Kenya on February 20, 1970, and that this dereliction of duty by those in control of the vessel was a proximate cause of his death.

In its present procedural posture, the matter is before us as a case stated for determination of the issue of jurisdiction. The facts adduced by the parties during discovery establish manifold and significant contacts with the Republic of Panama. Thus we are confronted at this juncture with the following two issues: *First*: To what extent should a judgment of the Supreme Court of Justice of Panama, which arises out of the same incident and involves the same parties, be determined by us to be final and binding on the basis of the doctrine of comity between nations? *Second*: Given the factual background of this matter, are there such sufficient contacts with the United States as to permit application of the maritime law of this country?

We have determined, for the reasons stated *infra*, that this matter should be resolved on the *second* of the grounds before us for decision; i. e., the appropriate choice of controlling law. Our determination on this ground therefore obviates the need to venture into the factual and legal morass presented by the first issue. *We hold that the facts of the instant case mandate application of the law of Panama; accordingly, we will decline to take jurisdiction over the matter, and will dismiss the action on the ground of forum non conveniens, based upon the virtually exclusive contacts between the Republic of Panama and the subjects and subject matter of this lawsuit.*

Our disposition of this action through the avenue of "choice of law" negates consideration of the doctrine of comity, and the recognition to be afforded the judgment of a foreign nation. Courts have too often been trapped in that thicket, and have emerged tattered and bloodied; the shredded fabric of decisional law with respect to the interpretation of the standards which govern the application of the doctrine of comity, and the rationale behind those standards in this area are, at best, studded with the thorns of inconsistency.

Because our analysis of the choice of law question convinces us that Panamanian law should be applied, and because that determination must lead to dismissal of the action on the ground of *forum non conveniens,* we will not decide the issue of comity; such a decision would, in the context of the matter before us be pure, or rather, impure dictum.[1] Our reasons follow:

## I. STATEMENT OF THE PERTINENT AND CONTROLLING FACTS

The relevant facts, including those stipulated by the parties, are as follows:

---

1. Indeed, among the following are the unsettled areas of law with which we would be confronted in considering the comity issue:

(a) Whether in the context of a suit brought under the federal admiralty jurisdiction, the issue is controlled by a state law, or some "federal common law". *See* Smit, *International Res Judicata and Collateral Estoppel in the United States,* 9 U.C.L.A.L.Rev. 44, 47 (1962); Reese, *The Status in This Country of Judgments Rendered Abroad,* 50 Colum.L.Rev. 783, 786 (1950).

(b) Whether the requirement of reciprocity enunciated by the Supreme Court in *Hilton v. Guyot,* 159 U.S. 113, 16 S.Ct. 139, 40 L.Ed. 95 (1895), remains valid in the face of continuing criticism by commentators, Smit, *supra,* at 49, and only "desultory acknowledgement" by the courts. *Somportex Limited v. Philadelphia Chewing Gum Corp.,* 453 F.2d 435 (3rd Cir. 1971), *cert. den.* 405 U.S. 1017, 92 S.Ct. 1294, 31 L.Ed.2d 479 (1972).

(c) Whether, in considering the twin doctrines of *res judicata* and *collateral estoppel,* as applied to the question of recognition of the Panamanian judgment, we are to consider these doctrines under the law of the United States, or of Panama. Smit, *supra,* at 62–63. It is for these reasons that we have concluded that such a voyage would be both unwise and unwarranted in light of our conclusion that the appropriate ground for disposition is declination of jurisdiction based upon the doctrine of *forum non conveniens.*

## A. Introduction

Plaintiff's decedent, Theodore Reyes, was a citizen and a resident of the Republic of Panama. From approximately May, 1964, until his death on February 24, 1970, he was employed as a seaman by defendant Texpan. During the initial period of his employment, he served aboard the SS Texaco London; he was then transferred to the SS Texaco Kenya in July, 1969, and at the time of his death had attained the status of able-bodied seaman aboard that vessel. The Texaco Kenya is owned by defendant, a Panamanian corporation, purportedly with its principal place of business in Panama City; during the period relevant to this litigation, the vessel was registered in Liberia, and carried that nation's flag.[2]

While aboard the Texaco Kenya, Reyes was employed pursuant to an employment contract executed with defendant in Panama in March, 1969. At the time he signed the employment contract, Reyes agreed to be bound by the "Conditions of Employment" which had been drafted by Texpan for the purpose of governing its relations with Panamanian seamen in its employ.[3] Those conditions unequivocally provide for application of Panamanian law to disputes arising out of his status as an employee.

Texpan, incorporated under the laws of Panama, is a wholly-owned subsidiary of Texaco, Inc., a Delaware corporation, with its principal place of business in New York City. The exact nature of the relationship between Texaco, Inc. and Texpan is a major point of dispute between the parties; plaintiff claims that Texpan is a mere facade to enable Texaco, Inc. to conduct its shipping affairs beyond the reach of the maritime law of the United States, while defendant Texpan maintains that it is a viable entity, separate and apart from its parent. We need not decide the full extent of the interrelationship between Texpan and Texaco; it is absolutely clear from the record before us, however, *that Texpan is a viable and separate corporate entity* engaged in the dual enterprise of (a) international shipping, and (2) marketing of petroleum products in the Republic of Panama.

## B. The Circumstances Surrounding the Death of Theodore Reyes

While the precise nature of the events leading to the illness and death of plaintiff's decedent are in dispute, the record before us establishes the following critical facts:

During the period prior to, and encompassing the illness and death of Reyes, the Texaco Kenya was engaged in short run voyages in the Caribbean. On February 18, 1970, the vessel was docked at Puerto Cortes, Honduras, and was scheduled to depart for Puerto Limon, Costa Rica on the following morning. Reyes was on shore leave on February 4th, and failed to appear for his scheduled watch that evening; while he did return before the vessel departed for Puerto Limon on February 19th, he did not arrive at his maneuvering post at the time of castoff, nor did he stand his appointed watch that morning. The cause of this breach of duty is in dispute; defendant claims that Reyes returned from shore leave too intoxicated to stand watch, while plaintiff alleges that Reyes was suffering the onset of his subsequently fatal illness.

Whatever the cause of Reyes' incapacity on February 18th and 19th, the record is clear that by February 20th, he had become ill. On that afternoon, he reported to the Master on the bridge that he was suffering from headaches and weakness in his legs; the Master ordered Reyes to return to his quarters. There was no medical officer on board the Texaco Kenya, but Reyes was visited in his cabin by the First Officer, and given aspirin tablets and vitamins. However, during the course of the four-day voyage to Puerto Limon, Reyes' condition continued to deteriorate; he gradually lost his

---

**2.** The nationality of the crew members on the Texaco Kenya was as follows: All the unlicensed seamen were Panamanian nationals, while all the licensed and petty officers were Italian nationals.

**3.** These Conditions were approved by the Labor Ministry of Panama effective April 5, 1968.

ability to walk, and at some point on February 21st or 22nd, he was taken to the ship's hospital in order to enable the ship's officer to monitor his condition on an ongoing basis. The vessel was not diverted from her scheduled route to Puerto Limon, nor was immediate medical assistance requested by radio; however, on February 22nd, the day before arrival in Puerto Limon, the Master of the vessel cabled ahead to request medical assistance immediately upon arrival at that destination.

Reyes was examined by a physician on board the Texaco Kenya while anchored in Puerto Limon harbor on the morning of February 23rd; as a result of that examination he was transferred immediately to a hospital, pursuant to the decision of the examining physician. At that juncture, plaintiff's decedent had totally lost the use of both of his legs, and was practically unconscious when taken ashore to Tony Facio Hospital. He died the following morning.

### C.  The Suit in Panama

Following Reyes' death, suit was instituted in the Third Labor Court of Panama by Amelia Zamora De Mateos, (plaintiff in this action), Rita Zamora, and Margarita Atares; they are, respectively, the mother, grandmother, and sister of the decedent. Texpan was the defendant in that action. Under Panamanian law, the beneficiaries of a deceased seaman may recover from the employer if the death was caused by a "professional risk".[4] A "professional risk" is one to which workmen are exposed by reason of the work they perform for the account of their employer.[5]

On August 16, 1972, the Panamanian Labor Court rendered judgment for plaintiffs.

The substance of that ruling was that while the exact cause of Reyes' death was a matter of conjecture, plaintiffs should enjoy the "benefit of the doubt" on this issue. Texpan appealed that decision to the Superior Court of Panama, which affirmed the judgment on February 9, 1973. The appeal was carried to the Supreme Court of Justice of Panama, which reversed the lower court on June 6, 1973;[6] that court held that the exact cause of death was unknown; hence, it ruled that plaintiffs had not met their burden of establishing that the cause of death stemmed from a "professional risk"; a "professional risk" could not be inferred, the court stated, merely because Reyes became ill while on duty. *Thus, the judgment in favor of Texpan stands as a final judgment in the courts of Panama, rendered, as it was, by the highest court of that sovereign state.*

### II.  PROCEDURAL HISTORY OF THE CASE

Suit was originally instituted in this court by plaintiff against both Texaco, Inc. and Texpan, as owners of the Texaco Kenya, and employers of plaintiff's decedent. Service was effected only against Texaco, Inc., which in its answer, and subsequent motion for summary judgment, vigorously denied that it either owned the Texaco Kenya, or had ever employed plaintiff's decedent.[7] *After many conferences which we held with the parties with a view toward resolution of the hot contest over this issue, on July 9, 1974, the parties entered into a stipulation, pursuant to which it was agreed that Texaco, Inc. would be dismissed as a defendant, and that counsel for defendant would accept service on behalf of Texpan, with the same force and effect as if a vessel*

---

4.  Our citation of Panamanian law is based on information obtained from the deposition testimony of Dr. Roy Durling, a Panamanian lawyer, and defendant's proposed expert on the law of Panama. In addition, defendant has submitted, as exhibits, translations of the decisions rendered by the Third Labor Court of Panama, the Superior Labor Court of Panama, and the Supreme Court of Justice of Panama. (Defendant's exhibit # 1).

5.  Panamanian Labor Code, Article 291.

6.  The complaint in the action before this United States District Court was filed on February 23, 1972; however, it was not assigned to us until July 2, 1973, subsequent to that decision of the Panamanian Supreme Court of Justice.

7.  Texaco, Inc.'s motion for summary judgment was denied by this court on June 18, 1974.

of Texpan had been legally attached in the port of Philadelphia. It was understood by the parties that the dismissal of Texaco, Inc. as a defendant would not give rise to any inference, other than the agreement of the parties that no further action would be pursued against Texaco, Inc.

We have previously noted that plaintiff claims jurisdiction under the admiralty law of the United States, as modified by the Jones Act, and the Death on the High Seas Act. Plaintiff avers that the fatal illness of Theodore Reyes was caused by the unsanitary conditions aboard the Texaco Kenya; specifically, she pinpoints an alleged lack of safeguards to protect crew members who are employed in the work of cleaning the tanks of the vessel; she contends, therefore, that these conditions rendered the vessel unseaworthy, and the defendant negligent; of greater significance, however, is the argument pressed most strenuously by plaintiff that unseaworthiness and negligence are established by the lack of proper medical treatment rendered to plaintiff's decedent, after he was taken ill.

Defendant has not only denied liability with respect to the merits of plaintiff's complaint, but has maintained throughout this tortuous litigation that the predominance of contacts with Panama precludes the application of United States law to this action. See Lauritzen v. Larsen, 345 U.S. 571, 73 S.Ct. 921, 97 L.Ed. 1254 (1953). Defendant asserts that there is not, and cannot be any basis upon which to justify the choice of the law of the United States as controlling in this litigation. Rather, the defendant argues the law of Panama is the proper choice. The bases for those contentions are as follows: (1) the accident (illness), occurred either on the high seas, or in a foreign port; (2) the decedent seaman was a Panamanian national who signed a contract of employment in Panama; (3) the shipowner-defendant is a Panamanian corporation; and (4) suit has already been instituted and resolved in the courts of Panama.

In response to this argument, plaintiff points to Texpan's status as a wholly-owned subsidiary of Texaco, Inc., an American corporation. Relying principally upon the decision of the Supreme Court in *Hellenic Lines Ltd. v. Rhoditis*, 398 U.S. 306, 90 S.Ct. 1731, 26 L.Ed.2d 252, rehearing denied 400 U.S. 856, 91 S.Ct. 23, 27 L.Ed.2d 94 (1970), plaintiff asserts that Texaco, Inc. should not be permitted to hide behind the cloak of a foreign subsidiary, and thereby escape its obligations under the maritime law of this country. The *base of operations* of Texpan, plaintiff avers, is in New York City, and this substantial contact with the United States is sufficient to dictate the application of United States law, and thus confer jurisdiction on this court.

The nature of the contacts with Panama, and in particular the nature of the relationship between Texpan and Texaco, Inc., were fully and exhaustively developed during discovery. We note that the decision of the Supreme Court of Justice of Panama was pronounced on June 6, 1973, subsequent to the filing of the complaint in this action. Based upon that decision, defendant argues that the issues before us have already been judicially resolved, and that the doctrine of comity dictates our recognition of the foreign judgment, with the concomitant result that this action be dismissed.

In light of the full development during discovery of the issues relative to: (1) the recognition to be accorded the Panamanian judgment, and (2) the proper choice of controlling law, we invited the parties to submit the matter as a case stated for determination of the issue of jurisdiction; it is now before us on that basis.

*Thus, we direct our attention to consideration of the choice of law, the controlling and dispositive issue; one which may be decided on the record before us.*

## III. CHOICE OF CONTROLLING LAW

### A. Lauritzen v. Larsen—the first six factors.

A decision with respect to the matter of choice of law requires an analysis of *Lauritzen v. Larsen*, 345 U.S. 571, 73 S.Ct. 921, 97 L.Ed. 1254 (1953). In that case, the Su-

preme Court enumerated seven factors to be considered in determining which nation's law should be applied in a maritime tort claim.

In examining the seven factors mandated by the *Lauritzen* decision, we will defer consideration of the fourth factor, the allegiance of the shipowner, until last, since that point is the primary one upon which plaintiff relies in contending that United States law should be applied. The remaining six factors are as follows:

(1) *Place of the Wrongful Act*—this factor is given little weight by the Court; in the instant case, it is of no significance, since the injury occurred either on the high seas, or in a port of Honduras or Costa Rica, and thus cannot assist us in determining whether Panamanian or United States law should be applied.

■ (2) *Law of the Flag*—"Perhaps the most venerable and universal rule of maritime law relevant to our problem is that which gives cardinal importance to the law of the flag." *Lauritzen, supra* at 584, 73 S.Ct. at 929. In the instant case, the Texaco Kenya flew the flag of Liberia, and thus that country's law should be applied, "unless some heavy counterweight appears." *Lauritzen, supra* at 586, 73 S.Ct. 921. *See also Hellenic Lines Ltd. v. Rhoditis,* 398 U.S. 306, 308, 90 S.Ct. 1731, 26 L.Ed.2d 252 (1970).

In this case, the "heavy counterweight" appears in the form of a "flag of convenience." The *Lauritzen* court clearly stated that vessel registration of this nature was not entitled to the same conclusive effect as that of a "legitimate" flag state. *Lauritzen, supra,* 345 U.S. at 587, 73 S.Ct. 921. In *Kontos v. S.S. Sophie C.,* 236 F.Supp. 664, 670 (E.D.Pa.1964), Judge Luongo, of this Court, confronted with a situation similar to that before us, stated:

> The vessel here is of Liberian registry and flies the Liberian flag. That is the sum and substance of its contact with Liberia. The flag is one of convenience. . . . Applying the factors reviewed in *Lauritzen,* the law of the flag, in this case a flag of convenience, must give way

to the "heavy counterweight" of the preponderating contacts with Greek law.

*See also Bartholomew v. Universe Tankships, Inc.,* 263 F.2d 437 (2d Cir.) *cert. denied* 359 U.S. 1000, 79 S.Ct. 1138, 3 L.Ed.2d 1030 (1959); *Southern Cross Steamship Co. v. Firipis,* 285 F.2d 651 (4th Cir. 1960).

As in *Kontos, supra,* the significance of Liberian registry is outweighed by the predominant contacts with another country; in this case, the Republic of Panama. We therefore conclude that the law of Liberia should not be applied in this case.

(3) *Allegiance or domicile of the injured—in the context of the matter before us, this factor weighs heavily in favor of the application of Panamanian law, for not only was Theodore Reyes a domiciliary of Panama, but it is extremely significant that an action was brought in the courts of Panama by his representatives, one of whom is the plaintiff in this action. Plaintiff administratrix, who is also a citizen and resident of Panama, therefore has been afforded the complete rights under Panamanian judicial process. As stated in Lauritzen,* "each nation has a legitimate interest that its nationals and permanent inhabitants be not maimed or disabled from self-support." 345 U.S. at 586, 73 S.Ct. at 930. (emphasis supplied). *The Republic of Panama has served this interest by opening its courts to the plaintiff.*

(4) *Place of contract*—this factor is given very little weight in *Lauritzen,* in that the place of contract of a seaman is often fortuitous. Again, however, this factor will be given more than passing consideration, because *Theodore Reyes agreed to Panamanian "Conditions of Employment", which, inter alia, guaranteed a forum in Panama for any dispute arising out of employment, including personal injury. We reemphasize that plaintiff has had the benefit of that forum, and of the fruits of that contract.*

(5) *Inaccessibility of foreign forum*—it is manifest that this factor provides no basis for the application of the law of the United States. *Plaintiff, as a domiciliary of Panama, who has already sued in that country*

on this claim, clearly has had full access to the foreign forum. This is not a case in which plaintiff will be without a remedy, if Jones Act jurisdiction is denied.

(6) *Law of the forum* —this factor is of very little significance. *Lauritzen* establishes that the law of the forum does not become a factor in the choice of law process simply because jurisdiction has been obtained. 345 U.S. at 590–92, 73 S.Ct. 921; *see also Pandazopoulos v. Universal Cruise Line, Inc.,* 365 F.Supp. 208 (S.D.N.Y.1973).

### B. Lauritzen v. Larsen—the seventh factor.

(7) *Allegiance of the defendant shipowner.* These preceding six considerations evidence absolutely no contacts with the United States which are, or could be sufficient to justify the application of the maritime law of this country; the Panamanian element in this case appears overwhelming.

Plaintiff, however, contends that the significance of the American contact with respect to the final factor to be considered under *Lauritzen* —that of the allegiance of the shipowner—mandates the choice of the law of the United States as controlling in this dispute. Plaintiff notes that the *Lauritzen* concept of shipowner's allegiance was expanded by the Supreme Court in *Hellenic Lines Ltd. v. Rhoditis,* 398 U.S. 306, 90 S.Ct. 1731, 26 L.Ed.2d 252 (1970), and argues that *Rhoditis* mandates that the shipowner's *base of operations* be given close scrutiny by the court in connection with a decision as to the choice of law questions. On this theory, she avers that Texpan's base of operations is not in Panama, as claimed by defendant; rather, it is in New York City, the principal place of business of the corporate parent. Plaintiff claims that when the "facade" of foreign incorporation is pierced to reach Texaco, Inc., this resulting substantial contact with the United States requires us to apply the laws of this country. Resolution of this issue requires us in the

first instance, to analyze closely the facts and rationale of *Rhoditis.*

In *Hellenic Lines Ltd. v. Rhoditis, supra,* a Greek seaman brought suit under the Jones Act for injuries received aboard ship in the port of New Orleans; the seaman, Rhoditis, was a citizen of Greece, and had registered and enlisted as a seaman in that country; the contract of employment provided that disputes arising out of employment were to be adjudicated under Greek law in that country's courts.

The defendant shipowner was a Greek corporation, but its largest office was in New York City; moreover, more than 95% of the company's stock was owned by a Greek citizen who had been an American domiciliary for over twenty years, and who managed the company's affairs from his command post in New York. Based upon these facts, the Court held that the district court had properly applied the Jones Act to that matter, rather than the law of Greece.

The Court emphasized that the *Lauritzen* test is not to be applied by a mechanical counting of contacts; *"[t]he significance of one or more factors must be considered in light of the national interest served by the assertion of Jones Act jurisdiction."* 398 U.S. at 309, 90 S.Ct. at 1734. (emphasis supplied). The Court further stated that the list of factors in *Lauritzen* was not meant to be "exhaustive", and that the shipowner's *base of operations* was, specifically, another point to be considered.[8] In *Rhoditis,* the Court concluded that this base of operations, despite the facade of foreign incorporation, was clearly in the United States:

We see no reason whatsoever to give the Jones Act a strained construction so that this alien owner, engaged in an extensive business operation in this country, may have an advantage over citizens engaged in the same business by allowing him to escape the obligations and responsibility

---

**8.** While *Rhoditis* set forth that the base of operations was a factor to be considered in addition to those listed in *Lauritzen,* it bears sufficient relationship to the factor of shipowner's allegiance to justify our treatment of it under the

latter heading. *See Pandazopoulos v. Universal Cruise Line, Inc.,* 365 F.Supp. 208, 214 (S.D. N.Y.1973); *Pavlou v. Ocean Traders Marine Corp.,* 211 F.Supp. 320, 323 (S.D.N.Y.1962).

of a Jones Act "employer." The flag, the nationality of the seaman, the fact that his employment contract was Greek, and that he might be compensated there are in the totality of the circumstances of this case minor weights in the scales compared with the substantial and continuing contacts that this alien owner has with this country. *Hellenic Lines Ltd. v. Rhoditis,* 398 U.S. 306, 310, 90 S.Ct. 1731, 1734, 26 L.Ed.2d 252.[9]

Plaintiff in the instant case strenuously asserts that *Rhoditis* must control the resolution of the choice of law problem before us. She points out that *Rhoditis* involved 95% ownership of the foreign corporation by an American domiciliary, whereas the facts before us show 100% ownership of the stock of Texpan by Texaco, Inc. Despite this attempt by Texaco, Inc. to escape its

obligations under American law, plaintiff contends, we must find that Texpan's contacts with this country are predominant, and having so found, we must follow the *Rhoditis* holding and apply the law of the United States.

■ We reject such casuistic reasoning under the facts before us. Plaintiff's contention fails for two reasons. *First,* plaintiff *has already brought suit in Panama;* this crucially distinguishes the case from *Rhoditis.* We do not read *Rhoditis* to hold that once foreign incorporation, albeit American parent ownership, is shown, that, *ipso facto,* Jones Act jurisdiction must be found. *Such an interpretation would, in fact, produce precisely the mechanical application of the Lauritzen standards which was expressly disavowed by the Court in Rhoditis.*[10] We must, in the "totality of the

---

**9.** In *Rhoditis,* the Court cited the decision in *Bartholomew v. Universe Tankships, Inc.,* 263 F.2d 437 (2nd Cir. 1959), in which Judge Medina stated with respect to the foreign veil:

> Although appellant contends otherwise, the practice in this type of case of looking through the facade of foreign registration and incorporation to the American ownership behind it is now well established. [citations omitted]. This is essential unless the purposes of the Jones Act are to be frustrated by American shipowners intent upon evading their obligations under the law by the simple expedient of incorporating in a foreign country and registering their vessels under a foreign flag. [citation omitted]. In the case now before us appellant has taken the trouble to insert an additional nominal foreign corporation between the flag and the true beneficial ownership of the vessel. But we have little difficulty in brushing all this aside when considering the applicability *vel non* of the Jones Act. Complicating the mechanics of evasive schemes cannot serve to make them more effective. *Id.* at 442.

**10.** *But cf. Moncada v. Lemuria Shipping Corp.,* 491 F.2d 470 (2d Cir.), *cert. denied,* 417 U.S. 947, 94 S.Ct. 3072, 41 L.Ed.2d 667 (1974). The language in *Moncada* is ambiguous. There, the court determined that the facts before it evidenced substantial contact with the United States, and directed the application of the Jones Act; the court relied principally upon the fact that the stock of the foreign corporation was owned by Americans, but also noted that the vessel was managed and chartered from this country, that all the officers of the foreign corporation were American, and that the vessel

traveled frequently in ports of the United States.

In addressing the issue of Jones Act jurisdiction, it is clear that the court in *Moncada* applied the rule that Jones Act jurisdiction should be found if the American contacts are "substantial." *Bartholomew v. Universe Tankships, Inc.,* 263 F.2d 437 (2d Cir. 1959). It is not clear, however, on what basis this determination of substantiality was made. The court first noted the *Lauritzen* factors, and then, relying on the holding in *Bartholomew, supra,* stated:

> But . . . our task is not to weigh or balance present against absent contacts, *but merely to determine whether the contacts which are present are substantial.* 491 F.2d at 472. (emphasis supplied).

This language suggests that the court was determining the issue of substantiality in a vacuum; the factors which suggest foreign contacts are to be entirely ignored; the focus must be *only* upon those factors which evidence contacts with this country; if these factors are "substantial", the Jones Act must be applied. Applying this test to the case at bar, the fact that the parties have already adjudicated this dispute in the courts of Panama would become irrelevant; our examination would be restricted to the question of whether the ownership of Texpan by Texaco, Inc., evidences a "substantial" contact with the United States.

The court in *Moncada,* however, did not hold fast to this position; two sentences after the above-quoted passage, the court stated:

> Moreover, many of the factors *here favoring defendants* have been declared insignificant in *Lauritzen* and succeeding cases. *Id.* (emphasis supplied).

circumstances", consider the proper weight to be given to *each of the Lauritzen factors.* As we have already stated, the factors of domicile of the injured seaman, place of contract, and inaccessibility of foreign forum must be given more than ordinary significance in the present case; they are not "minor weights"; rather they provide the affirmative basis for application of the law of Panama.[11] *Thus, even in the face of domestic ownership of an allegedly "sham" foreign corporation, a proper consideration of all relevant factors in context dictates that the law of Panama be applied.*

*The second basis for rejection of plaintiff's argument is the utter failure to demonstrate that Texpan's incorporation in Panama is a "facade" to enable Texaco, Inc. to avoid its obligations under the maritime law of the United States.* It is, of course, an accepted fact that American shipowners frequently seek to avoid the stringent shipping laws of this country through the mechanism of incorporation in countries with less restrictive regulations. *Lauritzen v. Larsen,* 345 U.S. at 587, 73 S.Ct. 921. For example, in *Pavlou v. Ocean Traders Marine Corp.,* 211 F.Supp 320 (S.D.N.Y.1962), the shipowner corporation, while organized under the laws of Liberia, maintained *no office* in that country; based upon that fact, the court pierced the corporate veil; since there was a United States base of operations, it concluded there was jurisdiction under the Jones Act. *See also Pandazopoulos v. Universal Cruise Line, Inc.,* 365 F.Supp. 208 (S.D.N.Y.1973); *Bobolakis v.*

*Compania Panamena Maritima San Gerassimo,* 168 F.Supp. 236 (S.D.N.Y.1958).

Piercing a corporate veil cannot be equated to the exotics of Salome's dance; we cannot cast veils aside at will. *Simply because an American corporation owns the stock of a foreign corporation, it does not follow inexorably, or, indeed, even arguably, that the foreign corporation is a "facade" formed to enable the domestic corporation to escape its obligations under the laws of the United States. The record in the instant case, one based on a case stated, demonstrates that Texpan is a Panamanian corporation which maintains offices in Panama City; it pays taxes to the Republic of Panama; it is engaged not only in the business of international shipping, but also in the business of sales and distribution of petroleum products throughout the Republic of Panama; Texpan maintains an active bank account in Panama which is used in the usual and ordinary course of business of that company; while the President of Texpan is a United States citizen, none of the members of the Board of Directors of Texpan is a director of Texaco, Inc.; moreover, the day-to-day administration of affairs is managed from Texpan's office in Panama City.*

In support of its allegation that Texpan is a mere facade, plaintiff stresses the deposition testimony of the President of Texpan, Robert Chandler, which evidences a less-than-thorough knowledge of the shipping operations of Texpan, specifically with re-

---

It is apparent that in *noting the insignificance of the foreign contacts, the court did not restrict itself to an examination of the domestic contacts.* Thus, we do not believe that the *Moncada* decision stands for the proposition that we should totally ignore the contacts which suggest the application of another country's laws. Rather, as directed by the Supreme Court in *Hellenic Lines Ltd. v. Rhoditis, supra, we must examine all relevant factors, in the "totality of the circumstances", in order to determine whether the United States contacts are substantial and thus justify the application of the Jones Act.* If *Moncada* stands for a contrary proposition, we decline to follow it, and find no other case in this circuit, or elsewhere, which has adopted such a restricted basis for decision.

11. In responding to Texpan's argument that the doctrine of comity dictates dismissal of this action, plaintiff cites *Gillespie v. United States Steel Corp.,* 379 U.S. 148, 85 S.Ct. 308, 13 L.Ed.2d 199 (1964), for the proposition that the action in Panama was of no force and effect, because the Jones Act provides the "exclusive remedy" for the death of a seaman in the course of employment. *Gillespie,* however, held only that the Jones Act precluded the application of state wrongful death provisions; the applicability of foreign law in light of potential Jones Act jurisdiction was not an issue before the Court. *Thus, Gillespie is not relevant to the question of the degree to which we should consider the Panamanian judgment in applying the standards of Lauritzen v. Larsen, supra.*

spect to the ownership, registration, and manning of Texpan vessels.[12] We do not believe, however, that Mr. Chandler's inability to answer specific questions regarding the registration of particular Texpan vessels forms a sufficient basis upon which to pierce the corporate veil of Texpan, when balanced against the significant and continuing business operations and contacts maintained by Texpan as a separate and independent corporate entity, despite its ownership by Texaco, Inc.;[13] thus, we find that the defendant's base of operations is in Panama and that it is a separate viable entity. With this determination, all potential contact with the United States in this litigation vanishes, and no basis exists upon which to justify the application of the laws of the United States. The law of Panama must and does control in this case.

## IV. FORUM NON CONVENIENS

Despite our determination that the law of Panama should be applied in this action, and our recognition that a "final" judgment has been rendered in the courts of that country, we do not have in the record before us proof of the law of Panama with respect to the doctrine of res judicata; therefore, although this action arises out of the same incident which was the basis of the suit in Panama, namely, the death of Theodore Reyes, we will not dismiss this action under the doctrine of res judicata; the parties have not supplied us with the information necessary to make such a determination. Fed.R.Civ.P. 44.1.[14]

However, we will dismiss the action under the doctrine of forum non conveniens. This precept "presupposes at least two forums in which the defendant is amenable to process." Gulf Oil Corp. v. Gilbert, 330 U.S. 501, 507, 67 S.Ct. 839, 842, 91 L.Ed. 1055 (1947). The standards to be applied in determining the applicability of the doctrine were summarized by the Court in Gulf Oil, supra :

> Important considerations are the relative ease of access to sources of proof; availability of compulsory process for attendance of unwilling, and the cost of obtaining willing, witnesses; . . . and all other practical problems that make trial of a case easy, expeditious and inexpensive. . . . The court will weigh relative advantages and obstacles to fair trial. . . . But unless the balance is strongly in favor of the defendant, the plaintiff's choice of forum should rarely be disturbed. Id. at 508, 67 S.Ct. at 843.

■ Under this principle, courts sitting in admiralty have often refused to entertain actions between aliens in cases in which foreign law govern the issues. See generally Canada Malting Co. v. Paterson Steamships, 285 U.S. 413, 52 S.Ct. 413, 76 L.Ed. 837 (1932); see also Fitzgerald v. Texaco, Inc., 521 F.2d 448 (2d Cir. 1975), cert. denied, 423 U.S. 1052, 96 S.Ct. 781, 46 L.Ed.2d 641 (1976). The facts before us in the instant action present the precise situation which dictates the application of that doctrine; plaintiff and defendant are both citizens of the Republic of Panama; the law of Panama controls; the witnesses are located in Panama; the courts of Panama have already resolved the instant dispute under Panamanian law; if any further action is to be permitted under the laws of Panama, that country can best determine that issue. Hence, since plaintiff's choice of

---

**12.** Plaintiff, perhaps somewhat prone to hyperbole, states that "[n]ever in the history of deposition-taking was there ever such a total lack of knowledge about the operations in their own corporation by a president and marine superintendent as in this case." Plaintiff's Reply Brief, at 1.

**13.** While Mr. Chandler was not fully cognizant of the specific shipping affairs of Texpan, he explained that his duties were primarily directed toward the petroleum distribution aspects of the business; he stated further that principal responsibility for the manning of the Texpan vessels is under the control of Mr. Munoz, the marine supervisor of Texpan. Mr. Munoz is a Panamanian national. (Chandler deposition at 5–9, 19–20).

**14.** While we recognize that Rule 44.1 permits the court independently to research a question of foreign law, we think any resolution of this matter according to a Panamanian doctrine of res judicata is best relegated to the courts of that nation.

*forum is overwhelmingly counterbalanced by the contacts with the Republic of Panama, we decline to exercise jurisdiction, and accordingly, will dismiss the action on the basis of forum non conveniens.*

## V. CONCLUSION

Therefore, we conclude that the law of Panama controls in all respects in this litigation, and that this forum is inappropriate for further resolution of the issues, if any, which are still viable. Thus, we dismiss the action with prejudice. An appropriate Order will issue.