**Howard LITTLE, Plaintiff-Appellant,**

**v.**

**Charles F. GREEN, Defendant-Appellee.**

**No. 28161.**

United States Court of Appeals,
Fifth Circuit.

June 24, 1970.

Norman Miller, Miami, Fla., Jacob Rassner, New York City, for appellant.

Beverly, Moyle, Gentry & Jones, West Palm Beach, Fla., Harrison, Greene, Mann, Davenport, Rowe & Stanton, John T. Allen, Jr., Baya M. Harrison, St. Petersburg, Fla., for appellee.

Before JOHN R. BROWN, Chief Judge, and COLEMAN and CLARK, Circuit Judges.

CLARK, Circuit Judge:

Howard Little, a seaman who was injured while working as a member of the crew of the shrimp trawler ROVING GAMBLER, sued Charles F. Green, the owner of the vessel. Little's complaint contained a count under the Jones Act[1] for negligence, and a count under the General Maritime Law for breach of the warranty of seaworthiness.[2] The issues of negligence and unseaworthiness were tried to a jury and a general verdict was returned for the defendant. The plaintiff appeals on a claim of confusion between the legal principles applicable to negligence and the strict liability doctrine of unseaworthiness which allegedly arose both in statements of counsel to the jury and in the instructions of the court. He also contends the ROVING GAMBLER was unseaworthy as a matter of law. Finding no reversible error in the record, we affirm.

Plaintiff Little was acting as a rigman on the ROVING GAMBLER on January 6, 1967. He was operating winches to bring in the nets used for catching shrimp when the cable attached to the net overrode or wound upon itself on the winch drum. Little tried to correct the override by kicking it. His leg was caught in the cable and drawn into the winch and he was seriously and permanently injured.

At the time of the accident the ROVING GAMBLER had a crew of three: a captain who was in command and usually piloted the vessel; a rigman who operated the winches which lowered and raised the nets; and a header who cut

1. 46 U.S.C.A. § 688 (1957).

2. The complaint also contained a count for maintenance and cure, but this issue was separated from the rest of the case and reserved for the court. It is not before us on this appeal.

off the heads of the shrimp. Both the captain and the header were supposed to assist in certain phases of the net operations.

The ROVING GAMBLER operated two large trawl nets simultaneously—one off each side of the vessel—by trailing them from cables attached to port and starboard booms known as outriggers. The forward end of each trawl net was held open when in the ocean, by a pair of heavy wooden vanes called doors. Each net and set of doors was put out and hauled in through power supplied by a separate deck mounted winch. Each winch utilized approximately 150 fathoms of cable. This cable was shackled to an additional forty fathoms of double cable forming a bridle which ran to each of the doors.

Each winch was separately controlled by a pair of levers. One lever mounted horizontally and close to the deck of the ship, was operated by foot. This horizontal lever functioned as a brake to stop and hold the winch drum. The other lever was mounted in a vertical position and was intended to be operated by hand. By means of a friction coupling, this vertical lever caused power to be transferred to the winch. This power operated only in one direction (that of winding in the cable and nets), since the drag of the water on the nets as the boat moved forward supplied the necessary force to carry out the nets. The vertical levers were arranged so that pushing them toward each other operated the winches. Releasing the vertical levers released the friction coupling and permitted the winches to roll free, unless the foot lever brake was applied. When raising the nets, the captain reduced the speed of the trawler but remained in the wheelhouse until the bridle broke water, at which time the speed was further reduced and the captain was to come back to the winch and assist in the final operations necessary to bring up the nets.

The cable on the ROVING GAM-___ __R's winches was made of metal and ___" in diameter. As it wound onto __, the size of the cable and the

tension induced by the drag of the net were normally sufficient to keep it from overriding on itself, but such a condition did occur occasionally. When the bridle had left the water and begun to wind onto the winch, the bulk of the shackle and the double cable made it more likely that an override would occur than when the single cable was being taken in. Such an override of either the cable or the bridle was undesirable but it was not a major problem. No mechanical means of correcting an override was provided on the winches aboard the ROVING GAMBLER and no regularly used or known mechanical device for correcting such overrides was disclosed by the proof. One of Little's witnesses testified:

"Q Well, is there any other way for a man to do it [i. e. prevent or correct an override]? That you know of?

"A One of the latest methods we use, we have what we call a guide— I think one of our boats has it. It is a piece of steel that we put down over the bridle and it has a handle on it and we guide both those bridles in with that handle. *I haven't used it. I don't know how effective that is.*

"Q You do not have a mechanical means?

"A *There is no other way except physical—you could use your hands or your feet. That is the only way it can be done. Or just let it go like it is.*

"Q You know of no other method of getting that cable back?

"A No." (Emphasis supplied)

The preferred method of eliminating an override was for one of the crew members to tap the cable lightly with his hand. Instead of following this practice, Little chose to kick the cable on the occasion of his injury.

Acting without the captain's knowledge, Little had chained together the vertical levers that controlled the power to the two winches operating the sepa-

rate nets with a jury rig appliance he had brought aboard. The effect of this chain device was to keep the power to the winches locked in the on or incoming position without the necessity for the rigman's holding the two levers with his hands. Consequently, when Little's foot was caught, the winch power could not be stopped by simply releasing his hand hold on the levers.

In his brief and argument here, Little urges reversal on these points: (1) The vessel was unseaworthy as a matter of law. (2) Counsel for defendant, in his opening statement and closing argument, misstated the law applicable to unseaworthiness by intimating that the jury must find that Green had done something "wrong" in order for Little to recover and the court failed to correct the misimpression conveyed by such statement. (3) The instructions of the court failed to properly set out the law to the jury, in that they were confusing and improperly commingled principles of negligence and unseaworthiness.

Little makes no valid challenge of the jury's verdict on the negligence issue which he raised below. There is substantial evidence on which the jury could base its finding that Little knew the dangers of kicking the cable to correct an override. In fact it is without dispute that Little had been twice warned against this practice. Therefore, if he was to recover at all it must necessarily have been on the basis of unseaworthiness.

## I.

### UNSEAWORTHINESS

In the pretrial stipulation, Little stated it to be his contention that the vessel was unseaworthy because "a cable failed to wind evenly onto the drum [of the winch] but instead overrode and that thereby an unseaworthy condition existed; [and] that there were not a sufficient number of competent fellow seamen employed to perform the work required of the plaintiff." During argu-

ment over instructions to the jury, counsel for Little stated:

"My entire case and my summation has been based on the fact that the absence of a sufficient number of men to do a particular job—with the concession that otherwise the vessel was seaworth[y]—I respectfully ask Your Honor to charge the Jury that the definition of unseaworthiness includes the absence [of a sufficient number of crewmen]."

In his brief in this Court, Little again contends that the unseaworthy condition was the override. Evidence on both theories was developed in the trial court and we will consider them both on this appeal.

■ *The Override.* The jury had abundant evidence to find that an override, in itself, was not dangerous. There was testimony that the most that could happen when an override occurred was that the nets or the doors might come up out of the water unevenly, but that this difference in the location of the doors, even if it amounted to four or five feet, had no significant effect on the shrimping operations or the equipment and was in nowise dangerous to the vessel or its mission. Plaintiff testified, to the contrary, that the nets would be "torn wide open" if the doors came up unevenly, and there was other testimony that if the nets came up unevenly it was likely to throw the vessel off course. The jury had the right to resolve this conflict in the testimony against plaintiff and, therefore, the right to believe that an override was not an inherently dangerous condition that *required* correction. There was no evidence that the override aboard the ROVING GAMBLER, which Little tried to correct, was in any way a unique type of condition. It appears that an override may occur as a normal incident to the use of shrimp trawler winches. Counsel have directed our attention to no authority to support the proposition that this mere possibility of an override created an unseaworthy condition as a matter of law. In

the face of abundant evidence that overrides were neither dangerous nor a condition that demanded correction to permit continued operation and completion of the vessel's mission, we are not willing to so hold.

Plaintiff asserts that the vessel should have had some mechanical device to prevent an override. The record contains no substantial evidence that any such device in fact exists. We are only told that one of plaintiff's witnesses had information that a tool did exist that could be used to guide the bridle onto the winch drum. It should be noted that even this testimony was limited to a device to be used with the *bridle*. There is a sharp conflict in the evidence as to whether Little's injuries occurred as the cable was being wound onto the winch drum or whether it occurred as the bridle was coming in.

█ On appeal we are duty bound to accept all evidence in favor of the verdict as true and to give such evidence the benefit of all permissible inferences that would help sustain the jury's decision. Lyle v. Bentley, 406 F.2d 325 (5th Cir. 1969); Aircraft and Engine Maintenance, etc., Employees, Local 290 v. I. E. Schilling Co., Inc., 340 F.2d 286 (5th Cir. 1965), cert. den. 382 U.S. 972, 86 S.Ct. 528, 15 L.Ed.2d 464 (1966).

██ This is not to say that the vessel was proven to be seaworthy merely because the evidence showed that her winches were customary in the trade. Cf. Davis v. Associated Pipe Line Contractors, Inc., 305 F.Supp. 1345 (D.C., W.D.La.1968), aff. 418 F.2d 920 (5th Cir. 1969) and the dicta in June T., Inc. v. King, 290 F.2d 404 (5th Cir. 1961). But certainly no vessel is unseaworthy as a matter of law because it fails to carry equipment not shown to exist or if thought to exist, was not shown by some competent proof to be safer or superior to the method being used. Speculation is no substitute for probative facts. *See* e. g. Travelers Fire Insurance Co. v. Taylor, 171 F.2d 203 (5th Cir. 1949);

Cobb v. American Bonding Co. of more, 118 F.2d 643 (5th Cir. 1941).

█ *Insufficient Crew.* Whether Green supplied a sufficient crew to accomplish the task of bringing in the trawl nets was a question of fact for the jury. Waldron v. Moore-McCormack Lines, Inc., 386 U.S. 724, 87 S.Ct. 1410, 18 L.Ed.2d 482 (1967). The evidence showed that the normal crew on a shrimper of the type of the ROVING GAMBLER is three: a captain, a rigman and a header. This is not even a controverted fact issue. Little contends, however, that the captain should have been at the winch assisting him and guiding the cable as it came up. The record shows that at the time of the accident, the captain was in the wheelhouse and further shows that the proper place for the captain at all times the *cable* is coming in is where he was—the wheelhouse. According to the proof, until the bridle comes out of the water the captain is supposed to carry out duties in the wheelhouse.

█ Because of the direct conflict in the testimony already mentioned, as to whether the bridle had come out of the water at the time of Little's injury, the jury was free to believe either Little or the captain. Since we must accept that the jury found the bridle had not come up, then obviously the captain was in the proper place and the number of men aboard the ROVING GAMBLER—to do, and doing, the job to be done—was proper.

█ *In General.* The Supreme Court said in Mitchell v. Trawler Racer, Inc., 362 U.S. 539, 550, 80 S.Ct. 926, 4 L.Ed.2d 941 (1960), that an owner is not "obligated to furnish an accident-free ship. The duty is absolute, but it is a duty only to furnish a vessel and appurtenances reasonably fit for their intended use. The standard is not perfection, but reasonable fitness: not a ship that will weather every conceivable storm or withstand every imaginable peril of the sea, but a vessel reasonably suited for her intended service." The

ROVING GAMBLER did not fail to meet this standard as a matter of law.

 The rationale behind the doctrine of unseaworthiness is to protect seamen from dangerous conditions beyond their control.[3] Common sense says and pure mechanics confirms that if Little had not jury-rigged the vertical levers which controlled the power to the winches so that these levers did not have to be held continuously by hand to keep the winches turning, he would not have been injured. If Little's jury-rig had not locked these levers and hence the power to the winches, then the instant his foot touched the winch and he released his hold on the vertical levers the pull of the nets would have stopped the turning of the winch. His injury was attributable to his own contrivance, not to the machinery provided or procedures prescribed by the vessel. Had Little's jury-rig been part of the regular equipment on the vessel, or had some other member of the crew installed the jury-rig, the problem would be different. But here Little created his own danger and effectively caused his own injuries. The proof shows that the captain had no knowledge of the use of the jury-rig until he rescued Little. We recognize that a shipowner has been held liable under the doctrine of unseaworthiness even where he supplied a seaworthy vessel and proper appliances and crew, but an officer or crew member negligently rigged a device or appliance so as to render it temporarily unseaworthy and another crew member was injured. Mascuilli v. United States, 387 U.S. 237, 87 S.Ct.

1705, 18 L.Ed.2d 743 (1967) and the cases there cited. Cf. Antoine v. Lake Charles Stevedores, 376 F.2d 443 (5th Cir. 1967); Robichaux v. Kerr McGee Oil Industries, Inc., 376 F.2d 447 (5th Cir. 1967). What we are unwilling to here announce or apply is a new variation of that rule which would allow recovery for a condition of temporary unseaworthiness *deliberately* brought about without the shipowner or captain's knowledge, by the same seaman who then injures himself upon the very defect he intentionally creates.[4] Under these circumstances the owner did not, as a matter of law, violate his absolute duty to provide a seaworthy vessel.

We therefore reject all issues by plaintiff contending that the vessel was unseaworthy.

## II.

### STATEMENTS OF COUNSEL

Both in his opening statement and closing argument to the jury, counsel for the Defendant Green asked the jury to determine what his client had done that was wrong. On both occasions counsel for plaintiff objected on the grounds that recovery on the theory of unseaworthiness did not depend upon a finding that anyone had done anything "wrong". The district judge—on both occasions—told the jury they would be instructed as to the law by the court. Excerpts from the record showing the statements, objections and rulings appear in the margin.[5]

---

3. *See* Waldron v. Moore-McCormack Lines, Inc., supra.

4. Unseaworthiness does not extend to the *negligent* use of seaworthy appliances. Imperial Oil, Ltd. v. Drlik, 234 F.2d 4 (6th Cir. 1956), cert. den. 352 U.S. 941, 77 S.Ct. 261, 1 L.Ed.2d 236 (1956). See also 2 Norris, The Law of Seamen, § 618 (1962).

5. OPENING STATEMENT
"MR. BEVERLY: * * *
And let me suggest to you that in the course of hearing the evidence and in the course of examining the photographs and

documents that may be submitted to you, and particularly in the process of your deliberations back in that juryroom, that you keep in mind what the evidence will show and ask yourself this question: What did Charlie Green do wrong?
And answer that question specifically.
 * * * * *
MR. RASSNER: That is objected to, Your Honor. That certainly is not the law.
Our first cause of action is that, conceding that Charlie Green did nothing wrong.
THE COURT: All right.

 Plaintiff would have us read the word "wrong" as "negligent". Although this has been one meaning which has been accorded to "wrong", "wrong" is a broad word; it has differing meanings in various contexts. It may appear as a noun, verb, adjective or adverb. In the course of the various statements complained of, "wrong" was used as an adjective, a noun and, depending upon construction, an adverb. To construe it narrowly enough to require reversal when according it a more reasonable construction would not so require, is improper. If a facile reading of the record would uphold the trial and verdict, we should certainly not attach even an equally unrestrained significance to one single word that would have the effect of requiring a reversal and another trial. Cf. Texas & Pacific Rwy. Co. v. Jones, 298 F.2d 188 (5th Cir. 1962).

 We should view the argument in its context in the overall lawsuit. The setting and the contentions of both of the parties must be considered. In the

MR. RASSNER: *I object to counsel telling the Jury what the law is.*

THE COURT: I have your objection. Now, ladies and gentlemen, there are two causes of action in this case.

One is predicated on the question of unseaworthiness, and you will be instructed about the law applicable thereto.

The other is on the charge of negligence, and *you will be instructed about that.*

And you may proceed."

CLOSING ARGUMENT

"MR. BEVERLY * * *.

Now, obviously in any accident—particularly an accident of this nature—somebody has to have done something wrong.

MR. RASSNER: I object to that. That is not our first cause of action. We never complained that anybody did anything wrong.

THE COURT: All right, Counsel, you have your objection.

MR. RASSNER: May I have my objection sustained and the Jury instructed to disregard that "somebody must be proven to have done something wrong"?

THE COURT: I am going to instruct the Jury and I am sure that counsel will argue this within the framework of the instructions.

I have your objection, counsel. You may be seated.

MR. RASSNER: May I have the instruction to the Jury now to disregard the last comment of counsel?

THE COURT: No, sir. You may proceed, counsel.

MR. BEVERLY: To begin again: Obviously, in any accident—particularly one of this type—somebody has to have done something wrong.

MR. RASSNER: I object to that, Your Honor. Now he has done that twice and that is not the law.

THE COURT: *Ladies and Gentlemen of the Jury. I will instruct you as to the two causes of action and I will at*tempt to do that within the framework of the instructions.

Counsel is entitled to latitude in arguing, and I am instructing him that he may do that, and he understands what the Court's instructions will be and I believe he will do that within that framework.

And I have your objection, counsel.

All right, you may proceed.

MR. BEVERLY: Yes, sir. Your Honor, if I could be allowed to complete my sentence, maybe this would alleviate part of counsel from New York's problem.

Again, in an accident of this type—as in most every accident—somebody has to have done something wrong.

In this case, somebody did do something wrong.

Now, the allegations are, of course, that Charles Green did something wrong.

The proof, I think, at this point indicates that if somebody did do something wrong it wasn't Charlie Green or his agent, Mr. Pacetti who was the Captain of the vessel; but, contrarily, it was Mr. Little.

Now, I am going to talk about—I may be doing so needlessly because I think all of you understand—what he did wrong, how he did it wrong, and so forth; but I am going to try to pinpont it for you just a moment."

* * * * *

Because, again, we are back to the same thing; and that is who did what wrong?

Remember I ask you on Opening Statement to place one question in your mind and attempt to keep it there throughout the duration of this lawsuit and see how you would answer it.

That question was: What did Charles Green do wrong?

And I would simply suggest to you at this point that the evidence is, I think, very clear that Charles Green has done nothing wrong. (Emphasis supplied)

trial court the plaintiff based his right to recover on one count of neglect or fault and on one count of unseaworthiness—which all concede to be a doctrine of strict liability or liability without fault. The argument is reasonably susceptible of a construction that defense counsel was attacking both the negligence and the unseaworthiness contentions by urging that Green was without "wrong" as to the charge of negligence and that Little's "wrong" in jury-rigging the winch levers (a condition for which Green was not responsible) caused the injury of Little's leg and made the second charge of unseaworthiness untenable; therefore if anyone committed a "wrong" that injured Little, it was Little himself and not Green. But putting the spoken remarks into the broader context in which they occurred is only part of the answer to the error assigned by Little on this point.

■ Two principal thrusts of Little's objection were that the remarks incorrectly stated the law *and* that the attorney for the defense was usurping the court's function by telling the jury the law applicable to the case. When Little's counsel first objected the Court then and there told the jury that there were two separate legal concepts involved in the lawsuit about to be presented to them for trial and that the law applicable to each concept would be given in the instructions of the court. In closing argument when objections were raised, they were told the same thing—that the Court would give them the law. We must assume that the jurors were responsive to their oaths and took the instructions of the Court seriously and based their actions and their verdict on those instructions. Such a required assumption cuts off speculation that the jury may have been confused by this lawyer talk.

■ When it came to the instructions themselves, the Court very clearly told the jury that liability for unseaworthiness did not depend upon negli-

gence, fault or blame. In part the charge stated:

"Liability for an unseaworthy condition does not in any way depend upon negligence or fault or blame. That is to say, the ship owner or operator may have exercised due care under the circumstances, and may have had no notice or knowledge of the unseaworthy condition which proximately caused, if it did, the injury or damage."

And the substance of this instruction was not given once but twice during the course of the charge. The facts properly proven and the law correctly applied caused plaintiff to lose his case. The result was not produced by the words of counsel opposite. We see no basis in the colloquy footnoted above to overturn this jury verdict.

### III.

### INSTRUCTIONS TO THE JURY

■ Plaintiff objects here to the giving of an instruction to the effect that recovery could only be had for injuries resulting from unseaworthiness which were foreseeable. The instruction he complains of stated:

"In a suit such as this the basis of recovery is negligence or unseaworthiness, and the negligence of the defendant or the unseaworthiness of the ship must be the proximate cause of the injury. In order for you to find that negligence or unseaworthiness is the proximate cause of an injury, it must appear that the injury was the natural and probable consequence of the negligence or wrongful act or unseaworthiness and that it ought to have been foreseen in the light of the attending circumstances."

Plaintiff also contended that the Court's charge as a whole confusingly commingled principles of negligence and unseaworthiness. As to both contentions, the complete answer is that neither objection is subject to review by this Court because counsel made no timely objection to such instruction in the court below

as positively required by Rule 51 of the Federal Rules of Civil Procedure.

When considering the charge to the jury, the District Judge held a conference—out of the presence of the jury—with counsel immediately after the close of the evidence. This conference was reported by the court reporter and appears in the record. The objections of counsel to various proposed instructions were made at this time, but the Judge made it quite clear that an objection at the charge conference did not relieve counsel of the duty to object at the close of the instructions before the jury retired to consider its verdict, as is required by Rule 51, F.R.Civ.P. Under this procedure, reasons for objecting previously stated at the charge conference would not have to be restated, but the objection would. We think that this is an admirable practice: it shortens the time between the end of the charge and the time the jury can begin deliberations, it gives counsel two opportunities to be heard on instructions, it delays the time for objections to the charge until counsel have had an opportunity to hear the entire charge as a whole, and it gives the judge the opportunity to modify his charge in the light of objections informally stated at the charge conference.

At the conclusion of the court's charge, counsel for Little objected because the definition of unseaworthiness did not include the element of absence of a sufficient number of men to do a particular job and because the charge did not state *in haec verba* that the burden of proof of contributory negligence was on the defendant. After this objection was made the court recalled the jury and added these requested charges. No further objection appeared in the record before the jury retired to consider their verdict. Counsel advised this court during oral argument that although the record did not reflect it, he stood up to object after the correcting instructions had been given and before the jury retired and the *District* Judge made a motion with his hand for counsel to sit down, to which counsel silently acquiesced. Counsel's observation could be taken as either implying an injudicious action on the part of the trial court or temerity on the part of counsel at his client's expense. We reject the temptation to dismiss both premises. It is sufficient for us to say that it is outside of our function as a *court of review* to consider contentions of this sort completely dehors the record.

The judgment appealed from is in all things

Affirmed.