Stella REYES, Administratrix of the Estate of Florentino Reyes, Deceased, Plaintiff-Appellant,

v.

VANTAGE STEAMSHIP CO., INC., et al., Defendants-Appellees.

No. 75–2696.

United States Court of Appeals, Fifth Circuit.

Aug. 26, 1977.

Frank E. Caton, Thomas B. Greene, III, Houston, Tex., for plaintiff-appellant.

James E. Ross, John L. Yates, Houston, Tex., for defendants-appellees.

Before BROWN, Chief Judge, HILL and FAY, Circuit Judges.

JOHN R. BROWN, Chief Judge:

The plaintiff-appellant, Stella Reyes, sued under the Jones Act, 46 U.S.C.A. § 688 and general maritime law for the death of her husband, Florentino Reyes, a member of the crew of defendant-appellee's SS NATIONAL DEFENDER. Reyes was employed as a seaman on board NATIONAL DEFENDER at the time of his death. The lower court found that the vessel was not unseaworthy in any respect, the Master, Officers and crew were not negligent and the sole, proximate cause of Reyes' death was his own negligence in attempting to swim in the ocean. The court rendered judgment for the shipowners and the widow appeals. We reverse the finding of fault but remand for a determination of damages.

Reyes was 44 years old at the time of his death. He was an American seaman employed as an oiler aboard NATIONAL DEFENDER. The ship departed Houston, Texas, on July 27, 1973, to carry a cargo of wheat to Russia and ultimately to proceed to Libya.

On October 1, 1973, the ship was anchored and moored at a terminal approximately one mile off the northern coast of Libya, loading a cargo of oil through underwater pipelines. A number of other vessels were moored nearby, similarly loading oil. The weather was calm and clear. In addition to the regular crew there was a Loading Master on board to supervise the loading operation. On that day, Reyes stood his regular watch in the engine room of the ship from 4:00 a. m. until 8:00 a. m., after which he ate breakfast in the crew's messroom. At approximately 9:00 a. m. he began working overtime, painting an emergency generator room of the ship.

At approximately 11:15 a. m., the ship's chief cook, Ramiro Gonzales, observed Reyes entering the messroom. Reyes was wearing a pair of cut-off blue jeans and was carrying a towel. He stated that he was going swimming, a statement that was not particularly unusual since the ship had its own swimming pool. At approximately 11:30 a. m., Reyes went to the ship's rail on the port side of the emergency generator room deck (approximately 35 feet above the water), hung his towel over the rail, placed his shower shoes on the deck, and then sat momentarily on the rail with his feet and legs hanging over the rail. He then let out a loud yell and jumped down into the ocean below.

He began swimming strongly away from the ship toward a mooring buoy which was

located off the stern of the ship, approximately 300 feet away. Several members of the crew, including his work partner, Sokolic, observed Reyes swimming, and for a brief time he could have been reached by a life ring or line. During this time, however, he was swimming easily and the crew made no attempt to assist him.

After Reyes swam outside the lee of the ship, he encountered a current, but continued to swim toward the buoy. When he was approximately 280 feet away from the ship and only about twenty feet short of the buoy, Reyes abruptly stopped swimming and lay motionless, face down, with his arms outstretched. At no time prior to this did Reyes ever cry for help or go beneath the surface of the water. No alarm was sounded by anyone on the ship, no life ring or life line was thrown to Reyes and no line-throwing apparatus was available or employed, although by the time he was motionless, a crowd of crew members had gathered to watch.

As Reyes swam away from the vessel some of the crew members became concerned. They were yelling and screaming that Reyes was overboard . . . was in the water. Chief Engineer Scott, hearing the commotion, ran from the deck to the Captain's midship office. The Captain, accompanied by the Loading Master, hurried onto the deck to assist Reyes. The Captain observed Reyes floating behind the buoy and realizing the urgency of the situation, told the Loading Master to call a work boat from a nearby ship to pick up Reyes.

NATIONAL DEFENDER was equipped with four lifeboats, only one of which was motorized. At the time of the incident, all of the boats were in their customary positions, suspended high above the water in davits. There was evidence before the court below that these lifeboats could be lowered to their embarkation points within four minutes after they are reached and manned by a four-member crew including an engineer. When Reyes was swimming in the water, however, the ship's position was such that the motorized boat would have had to travel completely around it, a

distance of 810 feet in length and 104 feet in breadth, in order to reach Reyes.

The Captain decided to employ the workboat of the nearby ship to pick up Reyes. It was immediately summoned by the Loading Master and directed to Reyes' body. At that time a doctor ashore was also alerted and told to stand by with emergency equipment. The workboat picked up Reyes but instead of going immediately to shore, went instead to NATIONAL DEFENDER where Chief Engineer Scott boarded it with Reyes' papers for the Libyian authorities. Then the workboat met a boat from shore with a doctor on board who attempted resuscitation, to no avail.

Reyes' body was returned to Houston, Texas, where a postmortem examination was conducted. The autopsy report indicated that death was caused by asphyxia due to drowning. The blood analysis indicated the presence of .185% alcohol.

Before NATIONAL DEFENDER departed Houston on her voyage to Russia, officials of the ship's owners ordered the Captain of the ship to maintain a quantity of beer aboard the vessel for sale to crew members. The practice of operating such a beer store or floating dram shop was unfamiliar to the Captain, however, and he questioned the advisability of doing so. He nonetheless complied with the ship owners' instructions, and added 350 cases of beer to his previous stock of 50 cases before the ship departed for Russia. There was evidence that the crew members availed themselves of the opportunity to drink beer while aboard ship. In fact, so much alcohol was consumed during the voyage that the Captain felt compelled to purchase 50 additional cases of beer in the port of Odessa, Russia in order to have an adequate supply for the remainder of the voyage.

### The Findings Below

The District Court found that the vessel was not unseaworthy by selling beer aboard. To the contrary, it found that while somewhat unusual, the practice was a measure of goodwill toward the crew. It further found that the Master, the Officers

and the crew acted with all prudence and diligence in undertaking to assist and to rescue Reyes. Were it not for the autopsy report—the court held—the evidence would not suggest that Reyes was to any degree intoxicated. While apparently he had partaken of intoxicants in moderate amounts, this did not affect his conduct or behavior and was in no sense responsible for or a proximate cause of his difficulties. The sole and only cause of his death was Reyes' conduct in undertaking to swim in the ocean. Based on these findings of fact, the court ruled as a matter of law that,

> while the law imposes upon the vessel and her Captain a paternalistic duty to protect a seaman, even from his own

injudicious conduct, where circumstances permit, where as here the sole and only cause of the disaster is that of the seaman's own negligence; and where the officers and crew did all within their power to rescue the victim when his danger came to their knowledge, there is no liability.

### Throw Out the Life Line

The fatal flaw in the opinion of the lower court lies in its disregard of the violation of Coast Guard regulations by NATIONAL DEFENDER, specifically, 46 C.F.R. § 94.-45–1 *et seq.*[1] The regulations require that

---

1. Subpart 94.45—Line-Throwing Appliances

§ 94.45–1  Application.

(a) The provisions of this subpart, with the exception of § 94.45–90, shall apply to all mechanically propelled vessels of 150 gross tons and over in ocean or coastwise service. Such vessels contracted for prior to November 19, 1952, shall meet the requirements of § 94.45–90.

§ 94.45–5  General.

(a) Line-throwing appliances of the impulse-projected rocket type, and the equipment auxiliary thereto, shall be of an approved type, constructed in accordance with Subpart 160.040 of Subchapter Q (Specifications) of this chapter. The service use of rockets shall be limited to a period of four years from date of manufacture, and replacement of out-dated items shall be made at the first port of arrival in the United States where such rockets are available, except that replacement shall be made in all cases within twelve months after the date of expiration.

(b) Line-throwing appliances of the shoulder-gun type, and the equipment auxiliary thereto, shall be of an approved type, constructed in accordance with Subpart 160.031 of Subchapter Q (Specifications) of this chapter.

§ 94.45–10  Type required.

(a) All vessels shall be fitted with an approved line-throwing appliance of the impulse-projected rocket type. However, vessels of less than 500 gross tons may substitute a line-throwing appliance of the shoulder-gun type.

§ 94.45–15  Equipment for line-throwing appliances.

(a) The following equipment must be carried for each impulse-projected, rocket-type-line-throwing appliance required by this subpart. The equipment must be stowed with the appliance in a case or box, except for the service lines and the auxiliary line,

which may be stowed in an accessible location nearby:

(1) Four rockets, two of which shall be of the buoyant type.

(2) Four service lines that—

(i) Are fabricated of the material specified in the approval of the appliance carried;

(ii) Have a length not less than that specified in the approval of the appliance carried;

(iii) Have a diameter from $7/32$ to $9/32$ inch;

(iv) Have a breaking strength of at least 500 pounds; and

(v) Are to be kept in a faking box or reel.

(3) Four prime ejector cartridges.

(4) One cleaning brush, one can of oil, and 12 wiping patches.

(5) One set of instructions from the manufacturer.

(6) One auxiliary line that is fabricated of—

(i) Manila and is at least 1,500 feet long and 3 inches or more in circumference; or

(ii) A synthetic material and is at least 1,500 feet long and is certified by the manufacturer to have a breaking strength of at least 9,000 pounds and inhibited to resist the effects of ultraviolet rays.

(b) The following equipment must be carried for each shoulder gun type, line-throwing appliance required by this subpart. The equipment must be stowed with the appliance in a box or case, except for the service lines and the auxiliary line which may be stowed in an accessible location nearby:

(1) Ten service projectiles.

(2) Twenty-five cartridges.

(3) Four service lines to be kept in faking boxes or on reels and to be fabricated of—

(i) Flax or cotton, not less than 400 feet long, $3/8$ inch or more in circumference, and having a breaking strength of not less than 250 pounds; or

(ii) Very flexible woven or braided synthetic material, not less than 600 feet long $1/16$ inch or more in diameter, having a breaking

all vessels of 150 gross tons and over in ocean or coastwise service maintain line-throwing appliances for rescue operations. The Captain of NATIONAL DEFENDER testified that the vessel did not have such equipment and that he thought it was illegal to use them. Vessels of 500 gross tons and over are required to have impulse-projected rocket type line throwers. The appliances must have lines of at least 1,500 feet in length and a breaking strength of at least 9,000 pounds.

In *Marshall v. Isthmian Lines, Inc.*, 5 Cir. 1964, 334 F.2d 131, 1964 AMC 1686, there was a violation of the Coast Guard regulations relating to the shipment of hazardous articles. There we said,

[t]he law is well established that violations of a statute which is intended to protect the class of persons to which a plaintiff belongs against the risk of the type of harm which has in fact occurred is negligence in itself. Inherent in this statement of the legal principal are three questions which must be resolved before liability could be imposed in this case on a negligence *per se* theory. What proof makes out a violation of the regulations? Were the regulations designed to protect the [plaintiffs]? Were they intended to protect against the risk of the kind of harm that occurred here . . . .

*Id.* at 134 (citations omitted); *see Phipps v. S.S. Santa Maria*, 5 Cir. 1971, 418 F.2d 615; *Manning v. M/V Sea Road*, 5 Cir. 1969, 417 F.2d 603; *Grigsby v. Coastal Marine Serv. Inc.*, 5 Cir. 1969, 412 F.2d 1011, 1969 AMC

strength of not less than 140 pounds and inhibited to resist the effects of ultraviolet rays.

(4) One cleaning rod with brush, one can of oil, and 12 wiping patches.

(5) One set of instructions from the manufacturer.

(6) One auxiliary line that is made of either—

(i) Manila and is at least 500 feet long and 3 inches or more in circumference; or

(ii) A synthetic material and is at least 500 feet long, and is certified by the manufacturer to have a minimum breaking strength of 9,000 pounds and inhibited to resist the effects of ultraviolet rays.

[CGD 72–135R, 37 F.R. 16179, Aug. 11, 1972]

§ 94.45–20 Accessibility.

(a) The line-throwing appliance and its equipment shall be kept easily and readily accessible and ready for use. No part of this equipment shall be used for any other purpose.

§ 94.45–25 Service recommendations.

(a) In firing the line-throwing appliances, the operating instructions and safety precautions furnished by the manufacturer should be followed.

§ 94.45–90 Vessels contracted for prior to November 19, 1952.

(a) Vessels of 150 gross tons and over in ocean or coastwise service contracted for prior to November 19, 1952, shall meet the requirements set forth in §§ 94.45–5 through 94.45–25. However, if a Lyle gun-type line-throwing appliance is already in service on such vessel, it may be continued in use so long as it is in good and serviceable condition, but may not be replaced by a similar installation. Where Lyle guns are used, the following requirements shall be met:

(1) The equipment enumerated in this subparagraph shall be carried for Lyle gun type line-throwing appliances. The equipment and the gun shall be stowed together in a suitable case or box. If the case or box does not meet the requirements of Subpart 160.-038 of Subchapter Q (Specifications) of this chapter for portable magazine chest, the powder and primers shall be separately stowed in a chest meeting such requirement.

(i) Six service projectiles.

(ii) Eighteen bags (2½ ounces each) of black powder marked "One-half normal charge for Lyle gun, 2½ ounces black powder" in a nonferrous metal screw-top container.

(iii) One approved firing attachment with accessories consisting of lanyard, wrench, washer to fit between barrel and shoulder of firing attachment, blank plug for screwing into gun when firing attachment is not in place, cartridge extractor, and 25 primers in a watertight metal box.

(iv) Twenty-five paper wads.

(v) Four service lines, each 1,700 feet in length, of 7/32-inch to 9/32-inch diameter flax or manila, and having a breaking strength of at least 500 pounds, to be kept in faking boxes or on reels.

(vi) One ram rod, 1 wire brush, 1 can of light petrolatum, and 12 wiping patches.

(vii) One tapered wooden plug for muzzle of gun when not in use.

(viii) One set of instructions furnished by the manufacturer of the gun.

(ix) One auxiliary line, 1,500 feet of 3-inch circumference manila.

(2) Accessibility. Same as § 94.45–20.

1513; *Venable v. A/S Det Forenede Dampskibsselskab*, 4 Cir. 1968, 399 F.2d 347, 1968 AMC 1437; *Provenze v. American Export Lines, Inc.*, 4 Cir. 1963, 324 F.2d 660; *Simmons v. Gulf and South American S.S. Co.*, (E.D.La.1966), 260 F.Supp. 525, aff'd, 5 Cir. 1968, 394 F.2d 504, 1968 AMC 1978.

■ In the application of these requirements to Reyes, the shipowners have made no attempt to dispute the testimony of the Captain that the ship was in fact not equipped with the safety appliance required by the regulations. Since the testimony was undisputed, we accept the proof on non-compliance. Reyes passes the first test.

Second, it is clear that Reyes was meant to be a beneficiary of the protective regulations. The purpose of the safety appliance is to rescue persons in distress. Whether they got in distress through their own carelessness or through the fault of another is irrelevant.[2] A person in distress needs to be rescued. Indeed, so far as responding to the high calling of the sea, it matters not that the person in distress is a stranger to the vessel. The line-throwing appliance was intended to rescue persons beyond the reach of ordinary life rings or life lines. The endangered person's status as a seaman makes the duty to rescue even greater due to the hazards of the sea. The very nature of the seaman's occupation is such that he is continually exposed to the hazards of the deep. If he is "cast into the sea by the violence of the elements or by misfortune or negligent conduct, he is completely dependent for care and safety upon such succor as may be given by the members of the crew." *Harris v. Pennsylvania R.R. Co.*, 4 Cir. 1931, 50 F.2d 866, 868, 1931 AMC 1303. Reyes passes the second test.

Were the Coast Guard regulations intended to protect against the risk of the kind of harm that occurred? Clearly they were. The line thrower is designed to project a life line over a much greater distance than it could be thrown by hand, enabling the ship to rescue persons at greater distances. Reyes was not farther than 300 feet from the ship at the greatest distance and would have been within reach of the line-throwing appliance had it been available for use. The failure to make it available under our three-pronged test constitutes negligence *per se*.

A finding of negligence *per se* does not end our inquiry. In a trial by jury such a finding would have the effect of taking the question of negligence out of the province of the jury and requiring the court to charge the jury that negligence had been established. In the lower court this case was tried without a jury. Had the proper legal analysis been applied by the lower court the next inquiry would have been to determine whether the failure to comply with the statute was excusable, whether the negligence of the defendant proximately caused the harm to the plaintiff and whether certain defenses will mitigate the damages.

■ Violation of a safety statute may be excused under certain circumstances. Thus where non-compliance was due to an emergency situation, or where compliance would be more dangerous than non-compliance, strict compliance has been excused. *See Chase v. Tingdale Bros.*, 1914, 127 Minn. 401, 149 N.W. 654 (child dashes into the street); *Cameron v. Stewart*, 1957, 153 Me. 47, 134 A.2d 474 (walking on the wrong side of the street where sidewalk is defective). There has been no showing of any justification for failure to comply with the statute here. Indeed, the only explanation for the breach was the belief by the Captain that the line-throwing appliance was illegal, a completely mistaken belief.

■ Once it is established that there has been an inexcusable violation of the statute causation adds no problem. We conclude that the district court erred in ruling that Reyes' negligence was the sole, proximate cause of his death. Our conclusion is based

2. The matter of Reyes' alleged negligence is a question for the measurement of damages, discussed *infra*.

in part on the standard of causation applicable under a Jones Act case. The test is not a strict measure of proximate cause but the more lenient measure of legal cause. A ship owner's negligence under the Jones Act need not be the sole proximate cause of an injury to result in liability, but may merely be a contributing cause. *Spinks v. Chevron Oil Co.*, 5 Cir. 1975, 507 F.2d 216; *Hern v. Moran Towing & Transp. Co.*, 2 Cir. 1943, 138 F.2d 900; *Johnson v. Griffiths S.S. Co.*, 9 Cir. 1945, 150 F.2d 224, 1945 AMC 887; Norris, The Law of Seamen § 693 (3rd ed. 1970); *cf. Andrews v. Chemical Carriers, Inc.*, 3 Cir. 1972, 457 F.2d 636, 1972 AMC 1113, cert. denied, 409 U.S. 874, 93 S.Ct. 120, 34 L.Ed.2d 126; Restatement 2d Torts § 430, Com. b.

The question of proximate cause in an action under the Jones Act turns on whether the actions of the defendant contributed to the injury even in the slightest degree. Proximate cause is not destroyed merely because the plaintiff may have also contributed to his own injury.

*Sanford Bros. Boats, Inc., v. Vidrine*, 5 Cir. 1969, 412 F.2d 958, 1969 AMC 1706.

■ The negligence of the defendant in failing to provide the statutorily required rescue equipment must have contributed to the death of Reyes since it was shown that several crew members were watching as he was swimming, they saw him encounter the strong currents and while they may not have had time or the authority to send out a life boat, or could not have thrown a life ring so far, they could certainly have discharged a line thrower, had it been available. As we said in *Spinks, supra*, since seamen are wards of admiralty and employers owe a high duty of care to them, "it would be anomalous to allow an overly strict interpretation of proximate cause to defeat the remedial purposes of admiralty tort law." 507 F.2d 216, at 223. Thus we hold that the ship owners' negligence was the legal cause of Reyes' death.

■ Comparative fault determines the extent, if any, of the seaman's negligence. The defense of assumption of risk is not available in these circumstances. While the seaman does assume the risk of those perils of the sea which are inescapable, no risk that can be reasonably controlled by the ship owner is assumed by the seamen. No matter how glaring the negligence of the seaman that may be said to have contributed to his injury, assumption of risk never rises to the level of even a partial defense. *Beadle v. Spencer*, 1935, 298 U.S. 124, 56 S.Ct. 712, 80 L.Ed. 1082; *The Arizona v. Anelich*, 1935, 298 U.S. 110, 56 S.Ct. 707, 80 L.Ed. 1075, reh. denied, 298 U.S. 692, 56 S.Ct. 945, 80 L.Ed. 1409.

While we reject the finding and legal conclusion that the injury was due to the sole negligence of Reyes, we do not find clearly erroneous that it was due impliedly in part to Reyes. But we are unable to determine the extent of which his own actions contributed to the death.

As the process is a comparative one we must dispose of the other charges against the ship which the District Judge rejected. We find one such finding clearly erroneous. The others we sustain.

■ We are amazed at the failure of the District Court to rule that Reyes was drunk at the time of his death. Perhaps it was the logical quandry: if he held Reyes drunk, it was because he had drunk too much. Since Reyes drank too much in the confined areas of a ship whose master (and owner) had supplied the intoxicants to the likely detriment of the seaman and the whole crew without any supervisory control of its use, the vessel must bear at least part of the fault. Were this an automobile case and had Reyes' blood analysis revealed that percentage of alcohol, he could have been arrested for driving while intoxicated in almost every state in the union. The practice of selling alcohol in such great quantities to the crew should not have been overlooked, or impliedly neglected by the District Court in its findings. Surely had this man not been drunk he would never have gone swimming in the ocean initially. It is the opinion of this Court that the practice revealed by this record of operating a floating dram shop makes a ship unseaworthy, and if not that, at least clearly negligent.

Certainly the sea holds enough perils for a sailor, even a sober one. But for his employer to supply the beer without adequate control and then complain that Reyes was negligent for being drunk on board ship is indeed ironic.

■ The other contentions of negligence raised by Reyes, failure to have life boat drills, failure to post a gangway watch, failure of the crew to respond, and failure of the officers to give directions, are not well taken. The evidence showed that the Captain in fact had life boat drills but did not record them in the ship's log. The failure to post a gangway watch adds nothing to the case. It is doubtful that had there been a gangway watch he could have done any more than was done under the circumstances, given the lack of adequate rescue equipment. The inaction of the crew members can be attributed to their inability to give orders. Certainly they did all they could be expected to do. The officers responding to the shouts of the crew acted with haste and good judgment, again, under the circumstances. Their failure to save Reyes was due to the ships' lack of a line thrower.

It is necessary to remand this case to determine either on this record, if sufficient, or on a record supplemented as the parties and the trial court feel appropriate or necessary, the extent of negligence of each. We caution on this remand that the trial court could not hold that Reyes was 100% negligent. *Manning v. M/V Sea Road, supra.*

REVERSED and REMANDED.

JAMES C. HILL, Circuit Judge, dissenting.

I respectfully dissent from the majority's reversal of the district court decision.

First, although I agree with the majority's finding of negligence *per se* based on the shipowner's failure to provide line throwing devices, the majority incorrectly builds on this conclusion with a further finding that the shipowner's negligence, as a matter of law, was a legal cause of the decedent's death. Second, the majority incorrectly finds that the defendant's sale of beer on board its ship made the ship unseaworthy or, alternatively, was clear negligence on the defendant's part.

In stating the appropriate standard of causation in maritime tort cases, this court indicated its preference for the "legal cause" doctrine rather than for the doctrine of proximate cause. This court stated in *Spinks v. Chevron Oil Co.*, 507 F.2d 216 (5th Cir. 1975), that "[a]n employer's negligence need not be the sole proximate cause of an injury to result in his liability, but may merely be a contributing cause of the accident." 507 F.2d at 221. The court described the "legal cause" standard as follows: [1]

> The elements of legal cause are negligence, a causal connection between the negligence and the injury, the invasion of a legally protected interest, and lack of a countervailing legally protected interest as a defense to liability. Restatement 2d Torts § 9. The defendant's negligence *must be a substantial factor in bringing about the harm*, with no rule of law relieving the actor of fault. . . . "Substantial" means more than "but for" the negligence, the harm would not have resulted, . . . and more than merely negligible negligence. . . . The gist of it is that some responsibility for the effect must accompany the cause. *Id.* at 223 (citations omitted). (emphasis supplied).

1. In addition, the court made the following statements which are particularly relevant to the case at bar:

> Under the Jones Act, even the slightest negligence suffices for a finding of liability. (footnote omitted).
>
> \*　\*　\*　\*　\*　\*
>
> The duty owed by an employer to a seaman is so broad that it encompasses the duty to provide a safe place to work. . . . By comparison, the seaman's duty to protect himself (the ground for any countervailing legal interest serving to exculpate the employer) is slight. His duty is to do the work assigned, not to find the safest method of work. 507 F.2d at 223. (citations omitted).

The court in *Spinks* also observed that the Jones Act is remedial legislation which extends to seamen the rights accorded railway workers under the Federal Employers' Liability Act ("FELA"), 45 U.S.C. §§ 51–60 (1970), and that it should be liberally construed in favor of injured seamen. Although I agree that all of the refinements of proximate cause are inappropriate to maritime tort law, I apprehend that a causal relationship between the negligence and the injury must be established before liability can attach. I believe that the particular facts of this case require the court to establish one of the outer limits of liability under the legal cause standard. Given the factual distinctions between *Spinks* and the instant case, the line-drawing process herein required can be accomplished without vitiating the remedial purposes so well articulated in *Spinks*.

The plaintiff in *Spinks* lived and worked as a maintenance employee aboard a jack-up drilling barge. His injury occurred when he slipped on a walkway adjacent to an area covered with detergent which he and a co-worker had applied and were supposed to clean up. In *Spinks*, there was, really, no issue raised as to the existence of a causal relationship, in fact, between the condition of the deck (soapy and slippery) and the injury to Spinks who slipped and fell on that deck. The issue addressed was that of responsibility in law for the condition of the deck at the time of the casualty. The trial court had concluded that Spinks' negligence was the "sole proximate cause" of his injury even though the co-worker and a supervisor shared responsibility for cleaning up the slippery surface. 507 F.2d at 220–21.[2] On appeal, this court reversed the district court's conclusion that Spinks, "the lowest member of the hierarchy" of workers, was solely responsible for correcting the dangerous condition which resulted in his injury. Further, we rejected the contention that Spinks, alone, was negligent when, in the course of his duties, he walked across the slippery floor, carrying a bucket in each hand instead of reserving one hand and arm to steady himself by use of hand rails, observing that "[h]is duty is to do the work assigned, not to find the safest method of work." 507 F.2d at 223. Having found that the employer was chargeable with acts of negligence contributing to the dangerously slippery condition, and having disposed of the contention that Spinks' actions vis-a-vis the danger were the sole cause of the injury, liability naturally followed.

In the case before us today, there is no such easy path to liability. The deceased, Reyes, was not merely "doing the work assigned." He willfully donned his swimming attire and deliberately flung himself into the ocean for a swim.[3] Once into the water, Reyes exhibited no desire to leave it. He pulled steadily away from the vessel towards a buoy. Nothing indicates that an available life ring would have interested him as an alternative to his sport. He had left the deck for his own purposes and he gave no sign of seeking safe return to it. Under the evidence, scores of lines might have been thrown by Coast Guard approved devices, improvised catapults, or whatever without having had the slightest deterrent effect upon Reyes.

Under these facts, the district court determined that Reyes, alone, authored his own casualty. The judge characterized that finding as the "sole proximate cause" of the event. Instructed by the teachings of *Spinks*, we know that the appropriate standard for determining actionable causation is legal cause rather than what is seen as the more stringent standard of proximate cause.

---

2. The trial court also found that the defendants were negligent in permitting use of a faulty soap machine and that its use might be "deemed to constitute an unseaworthy condition." The court held, however, that their negligence and the "deemed" unseaworthiness were not the proximate causes of Spinks' injury. 507 F.2d at 221.

3. In *Spinks*, had the seaman, with full knowledge of a soapy area of the deck, and with no duty to perform at or near it, decided for sport to run full pace upon it and slide across it, the case would be more nearly controlling.

Nevertheless, I apprehend that this review illuminates the critical distinction between this case and *Spinks*.

In the instant case, the conclusion that the crew members could have discharged a line throwing device, if one had been available, is the only hint of causation upon which the majority was able to hinge its determination of liability. The majority, therefore, assumes cause in fact from the existence of negligence.[4] But a mere possibility of causation is not enough for this court to hold, as a matter of law, that the defendant's

negligence was a contributing cause in fact of the injury. In reaching its finding of liability, the majority blurs the distinction between the fact of negligence and the fact of causation. The former is, by definition, established when the defendant is guilty of negligence *per se*, but the latter is not likewise automatically established.[5]

In *Spinks* the negligent acts of the plaintiff and the defendants were inextricably woven together to create the dangerous condition, *i.e.*, the soapy floor.[6] Here, the

4. Cause in fact must be established whether liability is determined under a legal cause, or a proximate cause, standard. Although the existence of either legal or proximate cause is a question of law, cause in fact is a predicate for liability under either concept. The court in *Spinks, supra*, stated this principle as follows:

> The concept of proximate cause often obscures the true analysis of a tort. A court makes a policy judgment on the limits of liability when causation in fact has been established. Prosser, Torts § 42 (4th ed. 1971). 507 F.2d at 222.

This case, therefore, is distinguishable from *Manning v. M/V Sea Road*, 417 F.2d 603 (5th Cir. 1969), cited by the majority. In *Manning* the cause in fact of the plaintiff's injury—a faulty manhole cover located on the deck of his ship—had been unexceptionally established in the district court. This court was called upon only to decide "cause in law" or legal liability for the injury. 417 F.2d at 605.

5. The majority holds that "[o]nce it is established that there has been an inexcusable violation of the statute *causation adds no problem*." (emphasis added). I must disagree. Causation is always a problem, in the sense that cause in fact must always be proved to establish liability. Even where negligence *per se* has been established, "[t]here will still remain open such questions as the causal relationship between the violation [of a statute or regulation] and the harm to the plaintiff . . . ." Prosser, Torts § 36 (4th ed. 1971). *See e.g., Heath v. Matson Navigation Co.*, 333 F.Supp. 131, 135 (D.Haw. 1971).

6. The court in *Spinks* placed great emphasis on its inability to say that the plaintiff's negligence could have been the only cause in fact of his injury. That this fact, not present here, was crucial in the court's analysis is evident from the following statement:

> As between Spinks, a nineteen year old seaman, and his supervisor, it cannot be said that Spinks *alone* had the duty to realize that carrying two buckets was dangerous, or to apply the anti-skid material, or to see that the deck was washed down. As between

Spinks and his co-worker, Walker was older, had worked on the barge two and a half years, and handled the nozzle applying the soap and steam in washing down the soapy deck. We state no opinion on the relative responsibility of these individuals. We do hold, however, that in the circumstances this case presents, the entire burden cannot be placed on the lowest member of the hierarchy. (emphasis in original) (footnote omitted). 507 F.2d at 223.

In this case, on the other hand, the district court on remand might very well conclude that Reyes alone was responsible for his death. Such a finding would exonerate the defendant from liability entirely. *Kelloch v. S & H Subwater Salvage, Inc.*, 473 F.2d 767 (5th Cir. 1973) (recognizing the proposition cited, but finding the district court's conclusion that plaintiff's negligence was only 30 percent not clearly erroneous); *Kell v. Greenville Mid-Stream Service Inc.*, 321 F.2d 903 (5th Cir. 1963); *Moore v. United States*, 347 F.Supp. 38, 41 (N.D.Cal.1972) (finding no nexus between the plaintiff's injury and the alleged negligence of the defendant and concluding that plaintiff's own negligence was the cause of his injury).

I am mindful of the Jones Act provisions concerning contributory negligence. 45 U.S.C. § 53 provides in pertinent part as follows:

> . . . the fact that the employee may have been guilty of contributory negligence shall not bar a recovery, but the damages shall be diminished by the jury in proportion to the amount of negligence attributable to such employee: *Provided*, that no such employee who may be injured or killed shall be held to have been guilty of contributory negligence in any case where the violation by such common carrier of any statute enacted for the safety of employees contributed to the injury or death of such employee.

Before this section is applicable, however, there must first be a finding that the defendant's negligence caused "in whole or in part" the injury to the plaintiff. 45 U.S.C. § 52. *Kernan v. American Dredging Co.*, 355 U.S. 426, 78 S.Ct. 394, 2 L.Ed.2d 382 (1957), there-

negligent act of the plaintiff is easily separable from the negligence *per se* of the defendant. The defendant failed to comply with a safety regulation. The plaintiff jumped overboard and swam away from his ship. Thus, although the absence of safety equipment was not established as a cause in fact of Reyes' death, separate and express determinations of causation with respect to both negligent acts are not only possible on remand, they are required for a proper resolution of this case.

As a result, I conclude that the question whether Reyes' death was caused in fact by only one, or both, of these acts of negligence must be resolved by the district court on remand. Although the finder of fact might conclude that the defendant's failure to provide safety equipment was a cause in fact of Reyes' death, it might just as easily find to the contrary. After cause in fact is established, and only at that point, can the questions of legal cause and the extent of liability, if any, be determined by the court.

In addition to finding that the defendant was negligent for failing to provide the necessary line throwing devices, the majority also finds that the defendant was either negligent or caused its ship to become unseaworthy by authorizing the sale of beer on board. The majority's finding of unseaworthiness or negligence was necessary to establish liability because the rule is well-established that a seaman cannot recover for injuries caused by his willful intoxication if his injury was not caused in any way by the vessel's unseaworthiness or by the defendant's negligence. *Little v. Green*, 428 F.2d 1061 (5th Cir.), *cert. denied*, 400 U.S. 964, 91 S.Ct. 366, 27 L.Ed.2d 384 (1970); *Barlow v. Pan Atlantic S. S. Corp.*, 101 F.2d 697 (2d Cir. 1939); *The S. S. Berwindglen*, 88 F.2d 125 (1st Cir. 1937); *Lortie v. American-Hawaiian S.S. Co.*, 78 F.2d 819 (9th Cir. 1935); *Weissbach v. Matson Navigation Co.*, 345 F.Supp. 1176 (N.D.Cal.1972).

I believe that the ship was not unseaworthy and that the defendant was not negligent for authorizing the sale of beer on board.

The rationale behind the doctrine of unseaworthiness is to protect seamen from dangerous conditions beyond their control. *Waldron v. Moore-McCormack Lines, Inc.*, 386 U.S. 724, 87 S.Ct. 1410, 18. L.Ed.2d 482 (1967); *Little v. Green*, 428 F.2d 1061 (5th Cir.), *cert. denied*, 400 U.S. 964, 91 S.Ct. 366, 27 L.Ed.2d 384 (1970). The mere presence of liquor aboard a vessel, therefore, does not automatically render it unseaworthy. *Kontos v. S.S. Sophie C.*, 236 F.Supp. 664 (E.D.Pa.1964). The vessel would be unseaworthy only if, for example, liquor consumption caused the crew to become undisciplined, thereby endangering the crew, the cargo, or the ship. *Boudoin v. Lykes Brothers Steamship Co., Inc.*, 348 U.S. 336, 75 S.Ct. 382, 99 L.Ed. 354 (1955); *Clevenger v. Star Fish & Oyster Co., Inc.*, 325 F.2d 397 (5th Cir. 1963). This is not the case before us.

The defendant in this case authorized the sale of beer as a goodwill gesture toward the crew. As the district court found, the crew was disciplined in its beer consumption. The Master sold only beer to the crew, and he limited the amount of beer that each crewman could buy. Although occasionally a crewman was intoxicated while on board ship, no crewman was permitted to work while intoxicated. If a crewman misbehaved while on board due to intoxication, the Master would not permit that crewman to buy any more beer. On at least one occasion, the Captain confiscated alcoholic beverages from a crewman. Finally, the plaintiff presented no evidence of serious disorders created by intoxicated crewmen. Thus, the sale of beer to the crew did not endanger the crew, the cargo, or the vessel, and the vessel was not rendered unseaworthy by the sale of beer on board.

---

fore, does not require a finding of liability on remand. In *Kernan*, the Supreme Court held that, even in the absence of negligence, the Jones Act permits recovery for the death of a seaman resulting from a violation of a statutory duty. Since cause in fact had been clearly established, however, *Kernan* did not eliminate the requirement of causation even though as in the instant case, the defendant had violated a Coast Guard regulation and was guilty of negligence *per se*.

The defendant also was not negligent for authorizing the sale of beer. Although the warranty of seaworthiness imposes an absolute duty on shipowners, the standard for negligence is only due care. *Cox v. Esso Shipping Co.*, 247 F.2d 629 (5th Cir. 1957). Therefore, when a plaintiff alleges that the defendant created a defective condition on the vessel, which is the test for unseaworthiness, the defendant cannot be found negligent if the defendant is not also held liable for violating the warranty of seaworthiness. *Usner v. Luckenbach Overseas Corp.*, 400 U.S. 494, 91 S.Ct. 514, 27 L.Ed.2d 562 (1971); 1B Benedict, Admiralty 3–58 (7th ed. 1976). Because I believe that the defendant's ship was not unseaworthy, I also believe that the defendant was not negligent in authorizing the sale of beer on board. As outlined above, the Master exercised due care in the sale and consumption of beer on board.

The majority, however, states that if the decedent had not been drunk, "he would never have gone swimming in the ocean initially." No basis in the record exists for this statement. Even if the evidence did support this statement, however, it is insufficient to hold the defendant liable. The plaintiff had the burden of proving that the defendant was negligent and that the defendant's negligence contributed to the plaintiff's death. *Traupman v. American Dredging Co.*, 470 F.2d 736 (2d Cir. 1972); *In re Atlass' Petition*, 350 F.2d 592 (7th Cir. 1965), *cert. denied*, 382 U.S. 988, 86 S.Ct. 551, 15 L.Ed.2d 476 (1966). The plaintiff did not carry this burden. Every witness who testified that he had talked with or observed Reyes the day of his death stated that Reyes did not act peculiarly that day, that he did not smell of alcohol, and that his appearance did not indicate that he had consumed any alcohol that day. The only indication that Reyes had been drinking was the autopsy finding of .185% ethanol in his heart blood.

If Reyes was drunk at the time of his death, the defendant is not liable because that fact would indicate intentional misconduct on Reyes' part; the crew was not allowed to work when drunk, and Reyes worked until shortly before his death. *Little v. Green*, 428 F.2d 1061 (5th Cir.), *cert. denied,* 400 U.S. 964, 91 S.Ct. 366, 27 L.Ed.2d 384 (1970); *Barlow v. Pan Atlantic S.S. Corp.*, 101 F.2d 697 (2d Cir. 1939). If Reyes was not drinking before he jumped over the side of the ship, a causal connection does not exist between the defendant's sale of beer and Reyes' death.

Finally, the sale of beer did not constitute negligence *per se* because it did not violate any statute or regulation. *Phipps v. S.S. Santa Maria*, 418 F.2d 615 (5th Cir. 1969); *Marshall v. Isthmian Lines, Inc.*, 334 F.2d 131 (5th Cir. 1964). In fact, as the district court found, the practice is recognized in 46 U.S.C. § 91, which exempts "spirits, wines, or other alcoholic liquors" in sea stores from disclosure in the ship's manifest.

For these reasons, I dissent from the majority's holding that the defendant's failure to provide line throwing devices was, as a matter of law, a legal cause of the decedent's death and that the defendant was negligent or its ship unseaworthy because beer was sold to crewmen on board. The majority's opinion unreasonably expands the bounds of causes of action for unseaworthiness and for negligence under the Jones Act.